**MILTON BOUHOUTSOS, JR., ESQ., LLC**
**MICHAEL BOTTON, ESQ., Of Counsel**
1913 Atlantic Avenue, Suite 190
Manasquan, New Jersey 08736
Tel:  (732) 528-6700
Fax:  (732) 528-6707
Email:  bouhoutsoslaw@gmail.com
**Attorney for Plaintiffs**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Ronald S. Wilczynski, Tom Smith, | ) | |
| Michelle Smith, Robert D. Donahue, | ) | |
| Gina Donahue, Anthony Storino, | ) | |
| Jane Storino, Pasquale Storino, | ) | **CIVIL ACTION** |
| Jose A. Cintron, Eddie Morris, | ) | |
| Henry Badillo, Elvis Badillo, | ) | **CASE NO.  3:12-cv-04335** |
| Mark M. Owens, Dale Wolf, | ) | |
| Arthur Ryan Kurek, Arthur Kurek, | ) | |
| Carol Kurek, Bryan Moshinski, | ) | |
| David Aregood, David Kost II and | ) | |
| Charlotte Kost, Eric Deer and | ) | |
| Sarah M. Deer | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Peter M. Redling, Jackie Skipper | ) | |
| Barrios, Firoz Shaikh, Popsy Interactive | ) | |
| Inc., Your Choice Interactive Inc., | ) | |
| Gedi System Inc., John Does I-IV | ) | |
| and ABC Inc. I-IV, | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

## **PARTIES**

Plaintiffs:

Ronald S. Wilczynski, residing at 432 18th Avenue, Brick, New Jersey 08724, Tom and

Michelle Smith, residing at 114 Colonial Ridge Drive, Haddonfield, New Jersey 08033,

Robert D. Donahue and Gina Donohue, residing at 569 Dorchester Drive, Rivervale, New

Jersey 07675, Anthony Storino and Jane Storino and Pasquale Storino, residing at 313

Curtis Avenue, Apartment C, Point Pleasant Beach, New Jersey 08742, Jose A. Cintron,

residing at 324 High Street, Elizabeth, New Jersey 07202, Eddie Morris, residing at 1018

Frank Street, Roselle, New Jersey  07203, Henry Badillo, residing at 1297 Salem

Avenue, Hillside, New Jersey 07205, Elvis Badillo, residing at 1297 Salem Avenue,

Hillside, New Jersey 07205, Mark M. Owens, residing at 430 Lafayette Avenue,

Kenilworth, New Jersey 07033, Dale Wolf, residing at 1626 Indian Hill Drive, Grafton,

Wisconsin 53024, Arthur Ryan Kurek, residing at 44 Evergreen Springs Drive,

Lakewood, New Jersey 08701, Arthur and Carol Kurek, residing at 44 Evergreen Springs

Drive, Lakewood, New Jersey 08701, Bryan Moshinski, residing at 2577 High Road,

Huntingdon Valley, Pennsylvania 19006, David Aregood, residing at 4445 S. Johnson

Court, Littleton, Colorado  80123, David Kost II and Charlotte Kost, residing at 4061

Berkshire Heights, Fort Mill, South Carolina 29708, Eric Deer and Sarah M. Deer

residing at 1522 Hubbard Court, Fort Mill, South Carolina  29708.

Defendants:

Peter M. Redling, residing at 302 Willoughby Boulevard, Greensboro, North Carolina

27408, Jackie Skipper Barrios, residing at 442 East 20th Street, Suite M.E., New York,

New York, 10009, Firoz Shaikh, having an office at 25 Newbridge Road, Suite 208,

Hicksville, New York 11801, Popsy Interactive Inc., having an office at 25 Newbridge Road, Suite 208, Hicksville, New York 11801 (hereinafter referred to as "Popsy"), Your Choice Interactive Inc., having an office at 442 East 20th Street, Suite M.E., New York, New York, 10009 (hereinafter referred to as "YCI"), and Gedi System Inc. having an office at 442 East 20th Street, Suite M.E., New York, New York, 10009 (hereinafter referred to as "Gedi").

## NATURE OF THE ACTION

1.      This is a minority shareholder discrimination and securities fraud action on behalf of purchasers of the common stock of Popsy Interactive, Inc . a North Carolina Corporation with offices in the State of New York (the "Company" and/or "Popsy") who purchased or otherwise acquired such stock through a private capital raise conducted between August 1, 2010 and in or about November 30, 2010 and was directed to residents of the State of New Jersey, which failed to comply with state and federal securities laws.    Plaintiffs seek to recover for injuries suffered from defendants' violations of the federal securities laws, the Security Act of 1933 etc.

2.      This is also a shareholders derivative action seeking the transfer of Patents that should be registered into the name of Popsy but are registered to another Company controlled and owned by the Defendants.  The Plaintiffs are seeking assignment of all Patents to Popsy from Defendants or companies controlled and owned by Defendants, as well as seeking removal of the Directors for Breach of a fiduciary duty to the Shareholders, and money damages from the Defendants for violation of U.S Federal and New Jersey and North Carolina Securities Laws as well as North Carolina Corporate Law.

3.      Pursuant to a Confidential Limited Offering Memorandum (attached to this Complaint as Exhibit A) the Defendants represented the existence of smart phone technology that was proprietary to Popsy Interactive Inc. and that patents would be filed for that proprietary technology. "Funds from the Placement will be used to complete the formal process of Patent Application and evaluations." This was a false representation as there was no smart phone proprietary technology owned by Popsy at that time. Defendants, Redling, Barrios and Shaikh failed to disclose that they only had a website with a working interactive television concept based on identical interactive television concepts owned by Defendants Your Choice Interactive Inc. and Gedi System Inc., which had, at the time of the offering was presented,  patent applications or patents pending on those same interactive television concepts.

4.      Defendants, Peter M. Redling, Jackie Skipper Barrios and Firoz Shaikh, issued a private stock offering as set forth in paragraph 1 which artificially valued Popsy Interactive Inc. at $20,000,000 and promised the investors that patents would be transferred to Popsy Interactive Inc. that were cutting edge technology related to interactive television that would lead to large profits and therefore a return on investment dollars. Defendants never disclosed that they already owned patents with similar technology under two other companies, Defendants, Your Choice Interactive Inc. and Gedi System Inc., which are owned and controlled by one or both of the Defendants, Peter M. Redling and Jackie Skipper Barrios.

## JURISDICTION AND VENUE

5.      This action arises under Sections 20(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5

promulgated pursuant to Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5. The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and on 28 U.S.C. §§ 1331 and 1337(a).

6.     Pursuant to 28 U.S.C. § 1332, diversity jurisdiction arises in that the amount in controversy is $445,000, the Plaintiffs to this action are citizens of several different states, specifically, the State of New Jersey, the State of New York, the State of North Carolina, the State of South Carolina, the Commonwealth of Pennsylvania, the State of Colorado and the State of Wisconsin. The individual Defendants in this action are residents of the State of New York and the State of North Carolina. The Defendant corporations are New York and North Carolina Corporations.

7.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78(aa), and 28 U.S.C. § 1391(b). Defendants transact business in this District, and many of the acts and transactions constituting the violations of law alleged herein, including the dissemination of materially false and misleading statements to the investing public, occurred in this District.

8.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## SUBSTANTIVE ALLEGATIONS

9.     In or about March of 2010 the Defendants started to solicit investors to invest in Popsy using multiple versions of the Confidential Limited Offering Memorandum and Power Point Presentations.

10.     On or after August 1, 2010, Plaintiffs Tom and Michelle Smith  met with Plaintiff, Ryan Kurek, at which time Plaintiff Kurek showed Plaintiffs Tom and Michelle Smith a Power Point Presentation attached to the Complaint as Exhibit C (hereinafter referred to as the "PPP") and the Confidential Limited Offering Memorandum attached to the Complaint as Exhibit A (hereinafter referred to as the "Offering Memorandum"). The PPP and Offering Memorandum were shown to most or all of the Plaintiffs in this action. The PPP was prepared by Plaintiffs, Ryan Kurek and David Aregood and Defendant Peter M. Redling. The representations made in the PPP and Offering Memorandum relating to technology purportedly owned by Popsy Interactive Inc. were all under the exclusive control and were furtherbased upon statements and information provided by Defendant, Peter M. Redling.

11.     In the PPP, it represents the following:

a.  "**Patent pending** [emphasis added] technology offers advantage within interactive space on multiple mediums." (Exhibit C, Page 3, second bullet-point).

b.  "**Patent-pending** [emphasis added] cell-sync technology communicates branded property messages with consumers in real time." (Exhibit C, Page 4, third bullet-point).

The aforementioned representations are false because there was no patent pending on behalf of Popsy Interactive Inc. when these representations were used to entice investors Tom and Michelle Smith as well as other Plaintiffs who relied on the same misrepresentations as of August 1, 2010. Any patents related to the purported technology was already owned by either one or both of Defendants, Your Choice Interactive, Inc. and/or Gedi System, Inc.

12.     The PPP also represents to investors the following:

a. "Smart Phone application and website that engages television viewers, live event attendees and web users through branded interactive platform." (Exhibit C, Page 4)

b. "All participation is coded and organized into analytic reports and graphs for accurate consumer demographic and behavior data." (Exhibit C, Page 4)

c. "Players set up their Popsy Profile and preferences on the website." (Exhibit C, Page 4)

d. "Popsy Challenges are delivered via visual or audio notification on television screens, event jumbo-trons or on web advertisements." (Exhibit C, Page 4)

e. "Popsy Players accumulate points for participation and redeem through the Popsy Reward Program." (Exhibit C, Page 4)

The aforementioned representations are false because as of August 1, 2010 there was no website, no smart phone application and no technology owned by Popsy Interactive, Inc.

13.     The PPP, sets forth pictures of a smart phone with a working Popsy Application.   (See Exhibit C, Pages 5, 6 and 8). This representation is false and misleading because at the time there was no smart phone application owned by Popsy Interactive Inc.

14.     The Offering Memorandum represents that "The Company is seeking the financing to launch Popsy Interactive's 'Baseball Challenge' Smart phone application. Though its working prototype has performed successfully, there still exists all the risks inherent in the establishment of a new business." (Exhibit A, Page 4, second paragraph). This statement is false because it refers to a "working prototype" of a smart phone application that did not exist until months later after the offering.

7

15.     The Offering Memorandum represents that "Upon or just prior to the launch of Popsy, the Company will file a patent pending on its processes, interfacing mechanisms and back-to-front end communication methodology. Additional filings with international patent offices will take place within 30 days of the domestic filing. The documentation will be meant to serve as 'first use' protection for the implementation of the Company's Interactive Smart phone applications. Funds from the Placement will be used to complete the formal process of Patent Application and evaluations." This statement is false because the Defendants (i) never filed a patent application on behalf of Popsy Interactive, Inc.; (ii) used Popsy funds to further prosecute the patent applications for Defendant Your Choice Interactive Inc.; (iii) Popsy funds were not used "to complete the formal process of Patent Application and evaluations" for Popsy Interactive, Inc.; (iv) Defendants Redling, Barrios and Shaikh knew that Popsy Interactive Inc. would be unable to obtain a patent on technology that had not yet been developed at that time and (v) Defendants, Redling, Barrios and Shaikh knew that they could not patent the Popsy Interactive Inc. technology because of the prior patents and/or applications filed by Gedi System Inc. and Your Choice Interactive Inc., which are substantially similar to the purported Popsy technology.

16.     The Offering Memorandum represents the following:

a.   "POPSY'S innovative Smart phone apps instantly create viewer and audience interactivity with television programming and live events, such as baseball and football games. POPSY's proprietary "TV Cell-Sync" and "Event Cell-Sync" technologies make it possible for viewers and fans to 'participate with' or 'learn from' broadcast programming and live events . . ." (Exhibit A, Page 8, second paragraph).

b. "Popsy's technology was created to exploit the difficulties that cable and satellite television companies have had over the last decade in launching, monetizing and standardizing interative TV." (Exhibit A, Page 11, second paragraph).

c. "Popsy will also utilize its other proprietary technology – Event Cell-Sync at Live Sports and Entertainment venues that include such facilities as: College Sports stadiums and arenas, Professional Sports stadiums and arenas, Sports Bars, etc."

The aforementioned statements are false because Popsy Interactive Inc. did not own, nor did there exist, any website, smart phone application or other "proprietary technology".

17.    The Offering Memorandum sets forth pictures of a smart phone with a working Popsy Application.  (See Exhibit A, Page 14). This representation is false and misleading because at the time there was no smart phone application owned by Popsy Interactive Inc.

At the time that Defendants, Redling, Barrios and Shaikh made these representations, the idea of using a smart phone to interact with television was a new medium for the same concept already owned, with patents pending, by Defendants Your Choice Interactive, Inc. and Gedi System, Inc.

18.    The business model of Popsy is to create a platform for advertisers to give television viewers the ability to interact with the advertisers through the viewers' smart phone or a cable set top box.  The concept is supposed to work as follows:  The viewer would be watching a sporting event or other TV show and during the commercials the advertiser would direct the viewer to play an interactive game through either an "app" on their smart phone which would go through the Popsy website or through their cablebox.

Viewers would have to pre-register by creating a profile of themselves with Popsy to become a participant. In addition, players could also operate the game through any set box available in the market such as GoogleTV, Roku, X-Box, WD ect. Viewers should then receive prizes for their participation in these games. These prizes should be provided by the advertiser promoting their products or through Popsy itself via a point system.

19.     In the Offering Memorandum, investors were promised the following: "Upon or just prior to the launch of Popsy, the Company will file a patent pending on its processes, interfacing mechanisms and back to front end communication methodology. Additional filings with international patent offices will take place within 30 days of domestic filing. The documentation will be meant to serve as 'first use' protection for implementation of the Company's interactive Smart phone applications. Funds from the Placement will be used to complete the formal process of Patent Application and evaluations."

20.     At the time Defendants published the Offering Memorandum they failed to disclose that a company owed by defendant Peter M. Redling and Defendant Gedi, had filed a Patent on May 30, 2000 application number 09/584,805, which is the same business model as Popsy, but limited to set box tops and makes reference to a plurality of communication devises including phones. Defendant Gedi filed a continuation on July 31, 2007 Application No. 11/831,433. That patent has now been granted under patent number, 7,269,837. The aforementioned patents and patent applications are for use of substantially similar interactive television technologies as those purported to be owned by Popsy Interactive Inc. The primary difference between the aforementioned patents/patent

applications and the purported Popsy "proprietary technology" is that consumers would access the same interactive television experience through a cable box, lap top or desk top computer whereas the Popsy "proprietary technology" permitted the access through a smart phone application. The Popsy "proprietary technology" cannot exist without the use of the aforementioned patented technology owned by Defendants YCI and Gedi.

21.     Defendants, Redling, Barrios and Shaikh were fully aware of the aforementioned patents/patent applications and the reliance of Popsy Interactive Inc. to use the technology owned by YCI and Gedi in order to operate as a business. Nonetheless, they failed to disclose this to the investors of Popsy Interactive Inc.

22.     Defendants also failed to disclose that prior to the formation of Popsy, the Defendants had raised capital for the same business model under Defendant YCI.  They failed to disclose that between April 6, 2006 and December 8, 2008 YCI had filed several patent applications[1] with the same business model as Popsy which were pending at the time the Popsy offering was made.

23.     If the aforementioned YCI patent applications are approved then Popsy would be required to get a license approval from YCI to operate as represented in the Offering Memorandum.

24.     The Offering Memorandum represents in regards to the "History of Losses; Financial Condition" of the Company, that, "The Company was formed in December, 2009 and had an accumulated deficit of $0 as of August 1, 2010." (Exhibit A, page 4, second paragraph "History of Losses; Financial Condition").

---

[1] On 4/6/2006 application number 60/789.932; On 4/6/2007 application number 11/697,499; On 5/27/08 application number 13/118,543; 12/8/2008 application number 12/330,003.

25.     The Defendants issued shares to prior investors of YCI without receiving any payments to Popsy from the YCI shareholders.[2]  This was also not disclosed to the Plaintiffs prior to their investments into Popsy.

26.     Defendants paid the prior debts of YCI with Popsy funds.  Susan Bresnan received a payment of $3,473.90 on September 28, 2010.  She also received four payments of $950.00 each through her company S. Brensan & Associates between November of 2010 through February 2011.  The Defendant Ms. Barrios has explained that the stock provided to Ms. Bresnan and the payments made to her were related to the debts of YCI and that she considers the debts of YCI to also be the debts of Popsy.

27.     Defendants were treating Popsy as a successor corporation of YCI with Popsy receiving all the liabilities of YCI without transferring the assets of YCI to Popsy.

28.     The aforementioned payments of YCI debt and transfer of shares to YCI shareholders without consideration directly contradicts the Offering Memorandum that represents there exists a "deficit of $0 as of August 1, 2010." (Exhibit A, page 4, second paragraph "History of Losses; Financial Condition").

29.     Defendants launched Popsy in or about November 16, 2010 at the Sports Business Journal's annual sports summit.  Based upon the representation made in the Offering Memorandum, it was represented that by December 1, 2010 the patents would be filed in the name of Popsy.

30.     Plaintiffs invested in Popsy based upon representations that the company would patent its technology and based upon representations that additional capital would be raised to enable the company to grow.

---

[2] Peter Landau received 2,000,000 shares equal to 10% of Popsy's outstanding shares; AJ Pino received 500,000 shares or 2.5% of Popsy's outstanding shares; and Susan Bresnan received 300,000 shares or 1.5% of Popsy's outstanding shares.

31.     In the Offering Memorandum,  Defendants represented that the funds raised would be used for the following reasons:

a.     To complete the formal process of patent application and evaluations. (See Exhibit A page 4 paragraph 6 titled "Proprietary Technology")

b.     To fund the launch of its interactive platform in North Carolina. (See Exhibit A page 10, paragraph 1)

c.     Popsy's earnings would be used in the development and expansion of its business. (See Exhibit A page 5 paragraph 3 "No dividends")

d.     The Offering Memorandum also outlines how Popsy intends to generate revenue, 1) Management Fees from Networks/Properties and Programs; 2) Development Fees from Advertisers; 3) Popsy's Measurability Reports 4) POPSY's Website; 5) Popsy's Proprietary Event-Cell-Sync Technology for Live, On-Site Events; 6) Popsy's Proprietary TV-Cell-Sync Technology for Broadcast TV events and programming.  (See Exhibit A pages 18-19).   The Offering Memorandum, implies that capital raised would be used to enable the company to generate additional revenue.

e.     The Offering Memorandum also provided a Development plan with Phases One through Five which had a time table for completion of October, 2011.  (See Exhibit A page 25).

The implication when reading the Offering Memorandum is that the Defendants would use the capital raised to accomplish the goals outlined in the Offering Memorandum.

32.     The Defendants failed to disclose that the capital raised would be used to pay themselves for the work they had completed prior to the Popsy offering on behalf of

YCI, Inc., in direct contradiction to the representations made in the Offering Memorandum that the Company had "a deficit of $0 as of August 1, 2010." (See Exhibit A, page 4, second paragraph "History of Losses; Financial Condition" ).

33.    Defendants would receive a regular salary even when the company had no revenue and without actually doing work for the company to justify a salary.

34.    Defendant Redling would use company funds to cover his personal expenses unrelated to the operations of Popsy.[3]

35.    Defendant Firoz Shaikh took a lump sum payment of $15,000.00 for prior work completed for YCI as well as a monthly salary of $4,522.75, in direct contradiction to the representations made in the Offering Memorandum that the Company had "a deficit of $0 as of August 1, 2010." (See Exhibit A, page 4, second paragraph "History of Losses; Financial Condition" ).

36.    In addition to making unearned salaries and other personal expenses being paid, the Defendants retained founders shares giving them a 64.5% controlling interest in Popsy.[4]

37.    At the time that Defendants started raising capital they solicited money from investors in the State of New Jersey but never registered with the State of New Jersey to sell securities as a Broker Dealer or in the alternative as exempt from regulations to sell securities in New Jersey.

---

[3] The Defendant Mr. Redling was issued a corporate credit card which was paid directly out of the account holding investors funds. Mr. Redling used the company credit card to pay his personal expenses, including fast food restaurants like IHOP and Panera Bread, Lowes hardware stores, gas stations, and Walmart Grocery Stores to name just a few. From November 10, 2010 through March 16, 2011 Defendant Redling spent a total of $8,357.24 on personal expenses in addition to having a monthly salary of $4,467.72. For a company with no revenue, this is a substantial salary and a lot of unexplained expenses.

[4] Peter Redling was issues 4,600,000 shares, 23% of outstanding shares; Jakie Barrios was issued 4,200,000 shares, 21% of outstanding shares; Firoz Shaikh was issued 4,100,000 shares 21% of the outstanding shares.

38.    The Defendants solicited then sold shares of Popsy to more than sixteen New Jersey State Residents[5] without registering as broker dealers and/or investment advisors as defined under N.J.S.A. 49:3-56.

39.    The Defendants in this action engaged in the sale of Securities within the State of New York in violation of New York General Business Law Art. 23-A, §§352-359-H.  Defendants failed to register Popsy with the Attorney General of the State of New York for an exemption of the Securities laws of the State of New York.  Defendants then solicited and sold shares of Popsy to Cynthia A. Bona, David Barbrack and Edmund B. Freeman, three New York State Residents.

40.    Defendant Popsy is a North Carolina Corporation, however, the Defendants have failed to comply with  N.C. Gen. Stat. §§ 55-1-1 et seq.  by failing to:

   a) issue a shareholder agreement to investors;

   b) issue stock certificates to investors;

   c) hold shareholder meetings and give notice of these meetings to shareholders;

   d) hold board of director meetings

   e) failing to provide access to company books and records upon request of shareholders.

   f) issue corporate minutes from shareholder meetings or director meetings.

41.    The Defendants have been managing Popsy and making major management decision regarding the future of Popsy without any shareholder votes on the decisions.  Included in these management decisions were the following:

---

[5] Ronald S. Wilczynski, Tom Smith, Michelle Smith, Anthony Storino, Jane Storino, Pasquale Storino, Robert Donahue, Gina Donahue, Lynn Doral, Henry Badillo, Elvis Badillo, Jose A. Cintron, Eddie Morris, Mark M. Owens, William Mayer, Evan Mayer and C. Delaran.

a) Termination of the company President Arthur Ryan Kurek.

b) Rejecting interest from investors of $5,000,000.00 in capital because it may result in the defendants losing their majority interest in Popsy.

42.     Shareholders have received no updates or communications regarding the operations of Popsy other than a November 21, 2011 letter (See Exhibit B ) from Defendant Redling which contained false representations.

## DEFENDANTS' MATERIAL MISREPRESENTATION AND OMISSIONS IN VIOLATION OF SECURITIES AND EXCHANGE ACT

43.     On August 1, 2010, Popsy,  issued the Offering Memorandum (Exhibit A) and PPP (Exhibit C), to investors which contained representations that the company (i) owned "proprietary technology" that did not exist; (ii) had patents pending on that technology; (iii) would file patents on the technology and (iv) had no prior debt or liabilities[6] and that  "upon or just prior to the launch of Popsy, the Company will file a patent pending on its processes, interfacing mechanisms and back to front end communication methodology.  Additional filings with international patent offices will take place within 30 days of domestic filing. The documentation will be meant to serve as 'first use' protection for implementation of the Company's interactive Smart phone applications.  The Offering Memorandum also represented that funds from the placement will be used  for the following reasons:

a) To complete the formal process of Patent Application and evaluations. (See Exhibit A page 4 paragraph 6 titled "Proprietary Technology")

---

[6] The facts supporting this statement are pled with specificity in the Substantive Allegations section of the Complaint.

16

b) To fund the launch of its interactive platform in North Carolina. (See Exhibit A page 10, paragraph 1)

c) Popsy's earnings would be used in the development and expansion of its business. (See Exhibit A page 5 paragraph 3  "No dividends")

44.     The Offering Memorandum also outlines how Popsy intends to generate revenue, 1) Management Fees from Networks/Properties and Programs; 2) Development Fees from Advertisers; 3) Popsy's Measurability Reports 4) Popsy's Website; 5) Popsy's Proprietary Event-Cell-Sync Technology for Live, On-Site Events; 6) Popsy's Proprietary TV-Cell-Sync Technology for Broadcast TV events and programming. (See Exhibit A pages 18-19).   The Offering Memorandum, implies that capital raised would be used to enable the company to generate additional revenue.   The Offering Memorandum also provided a Development plan with Phases One through Five which had a time table for completion of October, 2011.   (See Exhibit A page 25).   The implication when reading the Offering Memorandum is that the Defendants would use the capital raised to accomplish the goals outlined in the Offering Memorandum.

45.     On November 21, 2011, Popsy issued a letter to Shareholders that stated that the company had released "Version 2" of the Popsy Smart Phone application for the iPhone and Android operating systems.  That it anticipated that by mid-December Popsy will release "Version 2" for the Blackberry operating system.  It also predicted that by the 1st quarter of 2012, it expected the release of "Version 3".  The letter stated that Popsy had gone into active "acquisition mode" with an eye on, but not limited to securing 100,000 active members within 6 months of the new release. The letter also represented

that Popsy was in negotiations with "Ndidi Massay, formerly of ESPN, to secure agreements with NFL, NBA and MLB Alumni Associations. . ."

46.     Defendants' statements, as set forth above, were materially false and misleading and omitted material facts when made because Defendants knew, but failed to disclose, that   at the time Defendants published the Offering Memorandum that a company owed by Defendant Peter M. Redling and Defendant Gedi, had filed a Patent on May 30, 2000 file number 09/584,805,  which is the same business model as Popsy, but limited to set box tops and makes reference to plurality of communication devises including phones.  Defendant Gedi filed a continuation on July 31, 2007 application No. 11/831,433 granted now a patent number 7,269,837.   Defendants also failed to disclose that prior to the formation of Popsy, the Defendants had raised capital for the same business model under Defendant YCI.  They failed to disclose that between April 6, 2006 and December 8, 2008, YCI had filed several patent applications[7] with the same business model as Popsy which were pending at the time of the Popsy offering.   Based upon the existing Patent owned by Gedi and if the aforementioned YCI patent applications are approved, then Popsy would be required to obtain a license approval from YCI and or Gedi to operate as represented in the Offering Memorandum.

47.     Defendants statements were materially false and misleading and omitted material facts when made because Defendants knew they would be paying off the prior debts of YCI with Popsy funds, that the Defendants would issue shares to prior investors

---

[7] On 4/6/2006 application number 60/789.932;4/6/2007 application number 11/697,499; 5/27/08 application number 13/118,543; 12/8/2008 application number 12/330,003.

of YCI without receiving any payments to Popsy from the YCI shareholders.[8] The Defendants failed to disclose that the capital raised would be used to pay themselves for the work they had completed on behalf of YCI, Inc. prior to the Popsy offering, for example, Defendant Firoz Shaikh took a lump sum payment of $15,000.00 for prior work completed on behalf of YCI in direct contradiction to the representation that the Company had "a deficit of $0 as of August 1, 2010." (See Exhibit A, page 4, second paragraph "History of Losses; Financial Condition").

### THE TRUTH EMERGES

48.     It has been discovered that on or before August 1, 2010, there has been no patent pending on proprietary technology owned by Popsy Interactive, Inc. in direct contradiction to the PPP. (Exhibit C, page 3, second bullet-point and page 4, third bullet-point).

49.     It has been discovered that no patent pending has been filed on proprietary technology since August 1, 2010, in direct contradiction to the Offering Memorandum. (Exhibit A, page 4, "Proprietary Technology").

50.     It has been discovered that on August 1, 2010, Popsy Interactive Inc. had no smart phone application prototype in direct contradiction to the Offering Memorandum (Exhibit A, page 4, "Launch Stage Company").

51.     As of August 1, 2010, there has been no proprietary technology owned or developed by Popsy Interactive, Inc., in direct contradiction to the Offering Memorandum (Exhibit A at page 8, second paragraph, page 11, second, third and fifth

---

[8] Peter Landau received 2,000,000 shares equal to 10% of Popsy's outstanding shares; AJ Pino received 500,000 shares or 2.5% of Popsy's outstanding shares; and Susan Bresnan received 300,000 shares or 1.5% of Popsy's outstanding shares.

paragraphs, pp. 14, 15) and the PPP (Exhibit C at page 4, second, fourth, fifth, sixth bulletpoints, pp. 5-9, 11 fifth bulletpoint).

52.    As of the filing of this Complaint all of the software, smartphone applications and websites developed by Popsy Interactive Inc. are owned by other companies.

53.    It has been discovered that the patents and pending patent applications owned by Defendants YCI Inc. and/or Gedi Inc. require Popsy Interactive Inc. to enter into a licensing agreement with them in order to be able to use the purported smart phone technology.

54.    It has been discovered that on or before August 1, 2010, Popsy had assumed substantial financial liabilities of Defendant YCI Inc., in direct contradiction to representations made in the Offering Memorandum. (See Exhibit A, page 4, second paragraph "History of Losses; Financial Condition").

**SCIENTER**

55.    Popsy Inc. acting through its officers, Peter M. Redling, Jackie Skipper Barrios and Firoz Shaikh, knowingly or with deliberate recklessness for the truth issued to the investing public materially false and misleading statements. Defendants had exclusive control as to whether a patent application had been filed by Popsy Inc. at the time and had no patents pending at the time the PPP was shown to Plaintiffs. Plaintiffs had no way of verifying if there were any patents pending in August of 2010 because any patent application less than 18 months old will not be published by the United States Patent and Trademark Office. Since Popsy Inc. was less than 18 months old as of August

1, 2010 there is no way to confirm whether a patent application had been filed by Defendants.

56.    At the time that the Offering Memorandum was written, Defendants, Redling, Barrios and Shaikh were fully aware that Popsy Interactive Inc. had no smart phone application prototype. Defendants had exclusive control over the smart phone application prototype alleged to be owned by Popsy Inc. Plaintiffs could not possibly verify this information as it is not public information.

57.    At the time the Offering Memorandum and the PPP were written and shown to potential Plaintiffs, Defendants, Redling, Barrios and Shaikh were fully aware that no proprietary technology and no website had been developed or owned by Popsy Inc.. Defendants had exclusive control of the extent of the technology developed and owned by Popsy Inc.. Plaintiffs could not possibly verify this information as it is not public information.

58.    At the time the Offering Memorandum and PPP were written and shown to Plaintiffs, the Defendants were fully aware of the patents and patent applications pending on behalf of Defendants YCI Inc. and Gedi Inc. and that the existence of these patents/applications would require the need for a license agreement between Popsy Inc., YCI Inc. and Gedi Inc. for use of the purported technology.   Plaintiffs would not be reasonably expected to do a patent search on other companies owned by Defendants. Defendants had exclusive control over Patent applications 13/118,543 and 12/330,003, which were filed within 18 months of August 1, 2010 and would not be available for public inspection.

59.     The Defendants, Redling, Barrios and Shaikh fully intended to have Defendant Popsy assume the liabilities of Defendant YCI Inc. based on Defendant Barrios' written admission that she considers the debts of YCI to also be the debts of Popsy. Defendant Barrios' statement directly contradicts the representations made in the PPP that Popsy has "a deficit of $0 as of August 1, 2010." Defendant Barrios' statement was made subsequent to the Plaintiffs' investment in Popsy Inc. Defendants were in exclusive control of their undisclosed intent to have Popsy Inc. assume the liabilities of YCI Inc.

## RELIANCE AND ECONOMIC LOSS

60.     Plaintiffs relied on the representations made in the Offering Memorandum and the PPP when deciding to purchase shares of Popsy Inc. for a total investment of $445,000.

61.     At the time of the offering, the Plaintiffs believed they were purchasing shares of a company that owned proprietary technology that had patents pending and additional patents to be filed and that there were technological prototypes already in use and that smart phone applications permitting interactive television use were already in existence.

62.     As of the filing of this First Amended Complaint, all of the proprietary technology, specifically website and smart phone applications that were purportedly developed by Popsy Inc., are actually owned by third party companies.

63.     If Popsy Inc. had no proprietary technology at the time of the capital raise, and currently has no proprietary technology, then the value of the investment made by Plaintiffs was and remains at $0.00.

64.     The economic loss of the Plaintiffs is directly connected to the misrepresentations made by the Defendants in the Offering Memorandum and PPP because Popsy Inc. had no assets at the time the Plaintiffs purchased shares, in direct contradiction to representations made by the Defendants that Popsy Inc. did have assets.

## THE STATUTORY SAFE HARBOR DOES NOT APPLY

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegations that defendants failed to disclose material information they had an affirmative duty to disclose. The information defendants had a duty to disclose was not forward-looking, rather it concerns existing facts and events, including the Company's current financial condition.

## FIRST COUNT

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission)

66.     Plaintiffs repeat the allegations contained in paragraphs 1 through 65.

67.     The Offering Memorandum and PPP were materially false and misleading because defendants knew or recklessly disregarded the facts set forth therein to falsely continue to entice the Plaintiffs into thinking that the company was moving forward towards profitability.

68.     Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct in an effort to raise capital investments for the sale of Popsy Inc. common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

69.     As a result of the dissemination of the aforesaid false and misleading Offering Memorandum and PPP the price of the common stock that Plaintiffs paid was

higher than it would have been had the true facts concerning the Company's assets and the intended use of the funds been known by the Plaintiffs.

70.     In ignorance of the artificially high prices of   Popsy, Inc.'s Shares, plaintiffs acquired Popsy common stock at artificially inflated prices and were damaged thereby.

71.     Had the plaintiffs known of the true financial condition of Popsy, Inc., which was falsely represented by defendants, plaintiffs would not have purchased or otherwise acquired their Popsy shares.  Hence, plaintiffs  were damaged by defendants' violations of Section 10(b) and Rule 10b-5.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

(a)     Awarding plaintiffs damages in an amount to be proven at trial, together with prejudgment interest thereon;

(b)     Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

(c)     Awarding monetary damages against all of the defendants, jointly and severally, in favor of plaintiffs for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

(d)     Awarding plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees;

(e)     Transferring all of Defendants' ownership rights in the patents and patent applications to the Plaintiffs; and

(f)      Awarding plaintiffs such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

## SECOND COUNT

### (Violation of Section 20(a) of the Securities Exchange Act)

72.      Plaintiffs repeat the allegations contained in paragraphs 1 through 65 and the First Count.

73.      Each of the individual defendants, by virtue of his office or offices at, and/or directorship of the Company and his specific acts, was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.

74.      Each of the individual defendants' positions made him privy to, and provided him with actual knowledge of, the material facts that the Company misrepresented and concealed from plaintiffs.

75.      Each of the individual defendants had the power and influence, and exercised the same, to cause the Company to engage in the unlawful conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above.

76.      By virtue of the foregoing, the individual defendants have violated Section 20(a) of the Exchange Act.

77.      By virtue of the conduct alleged above, the individual defendants are liable to plaintiffs for the substantial damages that they suffered in connection with their purchase of the Company's common stock.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

(b)     Awarding plaintiffs damages in an amount to be proven at trial, together with prejudgment interest thereon;

(b)     Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

(c)     Awarding monetary damages against all of the defendants, jointly and severally, in favor of plaintiffs for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

(d)     Awarding plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees;

(e)     Transferring all of Defendants' ownership rights in the patents and patent applications to the Plaintiffs; and

(f)     Awarding plaintiffs such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

## THIRD COUNT

**(Failure to register with New York attorney general for exemption from New York General Business Law Art. 23-A, §§352-359-H)**

78.     Plaintiffs repeat the allegations contained in paragraphs 1 through 65 and the First and Second Count.

79.     The Defendants in this action engaged in the sale of Securities within the State of New York in violation of New York General Business Law Art. 23-A, §§352-359-H

80.     Defendants failed to register Popsy with the Attorney General of the State of New York for an exemption of the Securities laws of the State of New York.

81.     Defendants then solicited and sold shares of Popsy to Cynthia A. Bona, David Barbrack and Edmund B. Freeman, three New York State Residents.

82.     Plaintiffs have suffered damages as a result of Defendants failure to comply with New York State Law.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

(a)     Awarding plaintiffs damages in an amount to be proven at trial, together with prejudgment interest thereon;

(b)     Awarding monetary damages against all of the defendants, jointly and severally, in favor of plaintiffs for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

(c)     Awarding plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

(d)     Transferring all of Defendants' ownership rights in the patents and patent applications to the Plaintiffs; and

(e)     Awarding plaintiffs such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

## FOURTH COUNT

### (Violation of New Jersey securities law by failing to register as a broker dealer in violation of N.J.S.A. 49:3- 56 et. seq.)

83.     Plaintiffs repeat the allegations contained in paragraphs 1 through 65 and the First, Second and Third Counts.

84.     Defendants are required under N.J.S.A 49:3-56 to register as broker dealers and/or investment advisors with State of New Jersey before they can sell any Securities to residents of the State of New Jersey.

85.     The Defendants solicited then sold securities in the State of New Jersey and knowingly failed to register with the Bureau of Securities an issuer qualification application under N.J.S.A. 49:3-61 et. seq.

86.     The Defendants solicited investment from and then sold shares of Popsy to more than sixteen New Jersey State Residents[9] without registering as broker dealers and/or investment advisors as defined under N.J.S.A. 49:3-56.

87.     The Defendants are not exempt from registration as broker dealers and/or investment advisors as defined in  N.J.S.A. 49:3-56.

88.     Plaintiffs were damaged by the actions of Defendants.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

(a)     Awarding plaintiffs damages in an amount to be proven at trial, together with prejudgment interest thereon;

(b)     Awarding monetary damages against all of the defendants, jointly and severally, in favor of plaintiffs  for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

(c)     Awarding plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees;

---

[9] Ronald S. Wilczynski, Tom Smith, Michelle Smith, Anthony Storino, Jane Storino, Pasquale Storino, Robert Donahue, Gina Donahue, Lynn Doral, Henry Badillo, Elvis Badillo, Jose A. Cintron, Eddie Morris, Mark M. Owens, William Mayer, Evan Mayer and C. Delaran.

(d)      Transferring all of Defendants' ownership rights in the patents and patent applications to the Plaintiffs; and

(e)      Awarding plaintiffs such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

### FIFTH COUNT

### (Misappropriation and Conversion)

89.      Plaintiffs repeat the allegations contained in paragraphs 1 through 65 and the First, Second, Third and Fourth Counts.

90.  Defendants' actions constitute misappropriation and conversion of corporate funds, to the detriment of plaintiffs.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

(a)      Awarding plaintiffs damages in an amount to be proven at trial, together with prejudgment interest thereon;

(b)      Awarding monetary damages against all of the defendants, jointly and severally, in favor of plaintiffs  for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

(c)      Awarding plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees;

(d)      Transferring all of Defendants' ownership rights in the patents and patent applications to the Plaintiffs; and

(e)      Awarding plaintiffs such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

## SIXTH COUNT

### (Breach of Fiduciary Duty)

91.     Plaintiffs repeat the allegations contained in paragraphs 1 through 65 and the First through Fifth Counts.

92.     As directors and officers of Popsy, Inc., defendants have a fiduciary duty to plaintiffs to discharge their management responsibilities in good faith and not out of self-interest. Defendants have breached these duties.

93.     Defendants would receive a regular salary even when the company had no revenue and without actually doing work for the company to justify a salary.   Defendant Redling would use company funds to cover his personal expenses unrelated to the operations of Popsy.[10] and Popsy as well as a monthly salary of $4,522.75.

94.     In the November 21, 2011 letter to shareholders (Exhibit B), Defendant, Redling, as CEO of Popsy Inc., represented that as of November 21, 2011 "Version 3" of the smart phone applications for I-phone and Android was completed or soon to be completed.   No Version 3 was ever completed.   The letter also stated there were negotiations with "Ndidi Massay, formerly of ESPN, to secure second and first tier talent to work with Popsy." There have been no such meaningful negotiations with Ndidi Massay.   The letter also stated that the goal was to secure more than 100,000 active members of Popsy within the first 6 months of the release of "Version 2" of the smart phone application (which Defendant, Redling represented had been released as of

---

[10] The Defendant Mr. Redling was issued a corporate credit card which was paid directly out of the account holding investors funds.  Mr. Redling used the company credit card to pay his personal expenses, including fast food restaurants like IHOP and Panera Bread, Lowes hardware stores, gas stations, and Walmart Grocery Stores to name just a few. From November 10, 2010 through March 16, 2011 Defendant Redling spent a total of $8,357.24 on personal expenses in addition to having a monthly salary of $4,467.72.  For a company with no revenue, this is a substantial salary and a lot of unexplained expenses.

November 21, 2011). There has been no real plausible plan to get 100,000 members into Popsy and therefore was not a possible target within 6 months, considering the Defendants were actively procuring the technology and patents under YCI and Gedi at this point in time.

95.    Defendants knowingly paid YCI Inc. debts out of Popsy funds without any consideration to Popsy Inc.

96.    Defendants knowingly misrepresented to Popsy shareholders that Popsy Inc. owned proprietary technology and had patents pending and would be making future patent application filings, when it actually did not own any proprietary technology.

97.    Defendants' actions, as directors, officers and shareholders of Popsy, Inc., constitute a breach of their fiduciary duty to plaintiffs.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

(a)    Awarding plaintiffs damages in an amount to be proven at trial, together with prejudgment interest thereon;

(b)    Awarding monetary damages against all of the defendants, jointly and severally, in favor of plaintiffs for all losses and damages suffered as a result of the acts and transactions complained of herein, including punitive damages where appropriate, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

(c)    Awarding plaintiffs the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

(d)    Transferring all of Defendants' ownership rights in the patents and patent applications to the Plaintiffs; and

(e)     Awarding plaintiffs such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

MILTON BOUHOUTSOS, JR. ESQ., LLC
ATTORNEY FOR PLAINTIFFS

By: /s/Milton Bouhoutsos, Jr., Esq.
Milton Bouhoutsos, Jr., Esq.

Dated: September 14, 2012

## CERTIFICATION PURSUANT TO LOCAL CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding. Plaintiffs are not currently aware of any other party who should be joined in this action.

MILTON BOUHOUTSOS, JR. ESQ., LLC
ATTORNEY FOR PLAINTIFFS

By: /s/Milton Bouhoutsos, Jr., Esq.
Milton Bouhoutsos, Jr., Esq.

Dated: September 14, 2012

# EXHIBIT A

CONFIDENTIAL LIMITED OFFERING MEMORANDUM

Confidential Number: _____

# Popsy Interactive Inc.

## $250,000

250,000 shares of Common Stock ("Shares")
Price Per Share: $1.00
Minimum Amount Needed To Commence Operation: $25,000 (25,000 Shares)
Minimum Subscription: $1,000 (1,000 shares)

*Popsy Interactive Inc. (the "Company"), a North Carolina Corporation with representative offices in Greensboro, New York, Denver and Los Angeles is offering 250,000 shares of Common Stock for $1.00 per share.*
*The offering price per share has been arbitrarily determined by the Company - See Risk Factors: Determination of the Placement Price.*

**THESE ARE SPECULATIVE SECURITIES WHICH INVOLVE A HIGH DEGREE OF RISK.  ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE SHARES.**

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), THE SECURITIES LAWS OF THE STATE OF CALIFORNIA, OR UNDER THE SECURITIES LAWS OF ANY OTHER STATE OR JURISDICTION IN RELIANCE UPON THE EXEMPTIONS FROM REGISTRATION PROVIDED BY THE ACT AND REGULATION D RULE 504 PROMULGATED THEREUNDER, AND THE COMPARABLE EXEMPTIONS FROM REGISTRATION PROVIDED BY OTHER APPLICABLE SECURITIES LAWS.**

|  | Sale Price | Selling Commissions | Proceeds To Company |
|---|---|---|---|
| Per Share | $1.00 | $0.10 | $0.90 |
| Minimum | $25,000 | $2,500 | $22,500 |
| Maximum | $250,000 | $25,000 | $225,000 |

## Popsy Interactive, Inc.

25 Newbridge Rd.
Suite 208
Hicksville, NY  11801
(516) 232-2383

The Date of this Memorandum is August 1, 2010

# CAPITAL STOCK

*Popsy Interactive Inc. has 20 million authorized shares of common stock with no par value per share. The Company has issued 19 million shares. Pursuant to this placement, the Company has allocated 250,000 of the issued shares for subscribers. The Company has placed 1,000,000 authorized shares in Treasury for a future round of financing. The outstanding Common Stock is validly authorized and issued, fully paid and non-assessable.*

Holders of the Common Stock are entitled to one vote for each share held of record on each matter submitted to a vote of stockholders. There is no cumulative voting for election of directors.

Subject to the prior rights of any series of preferred stock which may from time to time be outstanding, if any, holders of Common Stock are entitled to receive ratably, dividends when, as and if declared by the Board of Directors out of funds legally available therefore and, upon the liquidation, dissolution or winding up of the Company, are entitled to share ratably in all assets remaining after payment of liabilities and payment of accrued dividends and liquidation preferences on the preferred stock, if any.

Except as otherwise provided in the Shareholders Agreement, holders of the Common Stock have no preemptive rights and have no rights to convert their Common Stock into any other securities.

# RISK FACTORS

The securities being offered by this Memorandum are speculative and involve a high degree of risk. The investment is not recommended for those who cannot bear the loss of their entire investment. Therefore, prospective Subscribers should consider carefully, in addition to the other information presented in this Memorandum, the following risk factors:

**Launch Stage Company:** The Company is seeking the financing to launch Popsy Interactive's "Baseball Challenge" Smart phone application. Though its working prototype has performed successfully, there still exists all the risks inherent in the establishment of a new business. Potential investors should be aware of the problems, delays, expenses and difficulties encountered by an enterprise in the Company's stage of development, many of which are beyond the Company's control.

**History of Losses; Financial Condition:** The Company was formed in December, 2009 and had an accumulated deficit of $0 as of August 1, 2010. There is no assurance that the Company's products will attain commercial acceptance or that substantial revenues will be derived from the sale thereof. In the absence of such acceptance, the viability of the Company cannot be sustained.

**Sufficiency of Funds; Need for Additional Funds:** There can be no assurance that The Company will be successful in generating revenues or that any revenues generated will be sufficient to result in positive cash flow. The Company may require additional funds before it begins to generate positive cash flow. Should the Company need additional funds, there can be no assurance that such funds will be available on terms favorable to the Company. The Issuance of debt securities might require the Company to issue options, warrants or other rights exercisable for or convertible into Common Stock. The issuance of shares of Common Stock will result in dilution to purchasers in this Placement.

**Minimum Amount Needed To Commence Operation:** The Company has set a minimum financing level of $25,000 to close this Placement. No checks will be placed into the Popsy Interactive Inc. bank account until such time that the combined total of subscriber checks has surpassed $25,000.

**Proprietary Technology:** Upon or just prior to the launch of Popsy, the Company will file a patent pending on its processes, interfacing mechanisms and back-to-front end communication methodology. The documentation will be meant to serve as 'first use' protection for the implementation of the Company's 30 days of the domestic filing. Additional filings with international patent offices will take place within Interactive Smart phone applications. Funds from the Placement will be used to complete the formal process of Patent Application and evaluations.

**Competition:** To date, the Company sees no direct competition to its product(s). The main focus for Smart phone initiatives has been towards streaming TV video and social networking, with the closest resemblance coming from applications that are "blending" the two.

4

**Dependence on Certain Personnel; Part-Time Personnel:** The Company is highly dependent upon the service of its officers and directors, all of whom are not being adequately compensated by the Company. To the extent personnel are employed on a part-time basis, there is no assurance that the Company will be able to obtain the services of these individuals when necessary.

**Control by Current Stockholders:** Following the completion of the Placement, Popsy Interactive Inc. Founding Shareholders will own approximately 93.75% of the outstanding shares of Common Stock assuming all of the shares offered hereby are sold. The current stockholders will, therefore, upon completion of the Placement, effectively have the ability to elect all of the directors of the Company and to control the outcome of all issues submitted to a vote of the stockholders of the Company.

**No Dividends:** The Company has not paid any cash dividends on the Common Stock since inception and does not anticipate paying any cash dividends in the foreseeable future. The Company currently intends to reinvest earnings, if any, in the development and expansion of its business.

**Absence of Public Market; Restrictions on Transferability:** There is presently no public market for the Company's securities, and it is not expected that one will develop upon completion of this Placement and there can be no assurance that a public market for such securities will ever develop, or that the Company will in the future make an initial public Placement of its securities, and there is no existing arrangement with any underwriter for such an Placement. The sale of the Common Stock offered hereby has not been registered under the Securities Act, or any state securities laws, and such securities may not be resold unless they are subsequently registered there under or exemptions from such registration are obtained. Such securities shall bear a legend specifying such transfer restrictions. Therefore, an investor may be required to retain his investment in the Shares for an indefinite period of time.

**Determination of the Placement Price:** The Placement price of the Common Stock has been determined by the Company's management. The price does not necessarily bear any relationship to the Company's assets, book value or other established criteria for valuing a privately held company. Accordingly, the Placement price should not be considered an indication of the actual value of the Company's securities.

# FURTHER INFORMATION

The Company undertakes, to the extent possible, to make available to every Subscriber or their professional representative, prior to any sale of the Common Stock offered hereby, the opportunity to ask questions of and receive answers from the Company relating to the terms and conditions of this Placement, and to obtain any additional information necessary to verify the accuracy of the information made available to such Subscriber or their representative.

Prior to making an investment decision respecting the securities described herein, a prospective Subscriber should carefully review and consider this entire Memorandum. Prospective Subscribers are urged to make arrangements with the Company to inspect any books, records, contracts, or instruments referred to in this Memorandum and other data relating thereto. Representatives of the Company will be available to discuss with prospective Subscribers any matter set forth in this Memorandum or any other matter relating to the securities described herein, so that the Subscribers and their advisors, if any, may have available to them all information, financial and otherwise, necessary to formulate a well informed investment decision. Further information and materials concerning the Issuer will be made available to prospective Subscribers at a mutually convenient location at any reasonable hour after any reasonable notice.

Popsy Interactive Inc., may be contacted at:

Popsy Interactive Inc.
25 Newbridge Rd.
Suite 208
Hicksville, NY  11801
(516) 232-2383

6

# Table of Contents

Executive Summary ................................................. 8
Leadership ........................................................ 9
Financial Projections Overview .................................. 10
Company Overview ................................................. 11
Product Description ............................................. 12 - 15
The Popsy Advantage ............................................. 16 - 17
How Popsy Generates Revenue ..................................... 18 - 19
Industry Overview ............................................... 20 - 21
Market Research ................................................. 21 - 22
Popsy's Competitive Advantage ................................... 23
Marketing & Sales Plan .......................................... 23 - 24
Popsy's Development Phases ...................................... 25
Popsy's Organization ............................................ 26
Popsy's Management Team ......................................... 26 - 29
Popsy's Board of Advisors ....................................... 30
Appendix

Market Statistics                                               32 - 33
Broadcast TV Ad Revenue Stats                                   34
Cable Advertising Revenue                                       35
Nielsen TV Audience Measurement                                 36 - 37
Financial Projections & Roll Out                                38 - 44

# Executive Summary

**POPSY Interactive Inc.** (the Company) is a software applications company established to launch a series of new, ground-breaking Smart phone applications. The Company is a C-Corp formed in North Carolina in 2009 with representative offices in Greensboro, New York, Denver and Los Angeles.

POPSY'S innovative Smart phone apps instantly create viewer and audience interactivity with television programming and live events, such as baseball and football games. POPSY's proprietary "TV Cell-Sync" and "Event Cell-Sync" technologies make it possible for viewers and fans to "participate with" or "learn from" broadcast programming and live events, as in the following ways:

**Predictive:**  Who will be eliminated at the end of the program (TV Reality Program)
Guess the next Play (Sports Event – TV or Live)
Who committed the murder (TV drama)

**Recall:**  What city were the characters visiting in the last scene (TV Entertainment)
The main character said he was born in what European country (TV Biography)
What type of car did the robbers use in the last scene (TV Mystery)

**Polling:**  Did you think the last guest interviewed was telling the truth? (TV Cable News)
If the election was held today, who would you vote for? (TV Broadcast News)
Do you agree with the last guest's opinion? (*C-Span)

**Trivia:**  Who was the last NY Yankee to hit 20 or more doubles in one season? (*Yes Network)
What state was FDR born in? (*History Channel)
What country is Chamonix in? (*Travel Channel)

**Informative:**  This is the recipe for the current meal being prepared (TV food channel)
Tiffany created this lamp in 1927 and it originally sold for $150 (TV home furnishing)
The Jones brothers both played college football at USC (TV College Sports)

*Networks/Channels are used for *Illustration purposes only.*

To maximize its reach in the "out-of-home" market, POPSY will utilize its proprietary technology at live sports events and entertainment venues, including a wide variety of stadiums, arenas and sports centers.

The Company's mission is:

- To encourage TV viewers to interact with television in a new, easy and effective manner
- To provide fans at live events a new and rewarding way to participate in sponsored games
- To become THE standard for TV and Event interactivity -- and to provide the market with the most accessible, rewarding and profitable solution to several of its most critical needs.
- To circumvent its competitors in the fields of interactive TV and analytics
- To be valued at $150M+ in three years

8

POPSY'S business model addresses many of the Industry's most critical needs:

- A direct and measurable link to TV viewers and Live event participants
- An improved bottom line in these difficult times for networks/properties, programs, brands and agencies
- Increased viewer and fan retention rates

## Leadership

**POPSY's** founders and leadership team consists of is a dynamic, talented and diverse group of experienced and success-oriented individuals who have a myriad of experience and relationships to fast-track success.  Here is a brief overview of the management team:

**Ryan Kurek,** *Co-Founder, CEO.*  One of the most creative and strategic leaders in the sports and entertainment field.

**Peter M. Redling,** *Co-Founder, Inventor, Managing Director.*  Creator of POPSY'S TV-Cell-Sync and Event-Cell-Sync applications.

**Jackie Skipper Barrios,** *Co-Founder, Managing Director.* An executive experienced in bringing new ventures to market and to business success.

**Firoz Shaikh,** *Co-Founder, CFO.*  A CPA with an entrepreneurial spirit that extends from domestic to multinational accounting and tax set-up resulting in a network of prominent contacts the world over.

**Tom Ising,** *Director of Strategic Partnerships*

**David Aregood,** *Executive VP, Sale & Marketing*

**Steve Pruett,** *Advisor, Television Networks*

**Maher Kawar,** *Advisor, Media Expert*

# Financial Projections Overview

Popsy has 19M shares issued and outstanding with a projected share value of $1 per share. The Company is seeking $250,000 in this round of financing, equivalent to 1.25% ownership of all Authorized shares, to fund the launch of its interactive platform in North Carolina. The company has an additional 1M authorized shares in Treasury for future financing.

## Revenue Total for All Sports

|  | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| Gross Revenue | $884,265 | $24,142,480 | $58,294,000 | $83,320,745 |
| Expenses ($) | $777,520 | $4,333,504 | $10,258,127 | $15,369,150 |
| Expenses as % of Sales | 88% | 18% | 18% | |
| EBITDA | $106,745 | $19,808,976 | $48,035,873 | $67,951,595 |
| Net Income | $148,984 | $12,875,835 | $31,223,318 | $44,248,136 |
| Estimated Share Value | NA | $0.6512 | $2.2124 | |
| With Multiplier of: | | | | |
| 2.5 | NA | $1.6281 | $5.5310 | |
| 5 | NA | $3.2562 | $11.0620 | |
| 7.5 | NA | $4.8843 | $16.5931 | |
| 10 | NA | $6.5124 | $22.1241 | |

| | |
|---|---|
| # of Shares Issued & Outstanding | 19,000,000 |
| # of Shares Offered | 250,000 |
| Investor Ownership of Authorized Shares | 1.2500% |
| Capital Invested | $250,000 |

# Company Overview

**POPSY Interactive Inc. (the Company), a C-Corp formed in North Carolina in 2009, is a software applications company established to launch ground-breaking mobile phone applications.**

Popsy's technology was created to exploit the difficulties that cable and satellite television companies have had over the last decades in launching, monetizing and standardizing interactive TV.

The Popsy platform will allow broadcasters, TV programs and Sports properties to quickly and economically roll out sponsored interactive services to viewers and fans **without** being subjected to cable and satellite restrictions, both technical and contractual.

POPSY will serve the television industry at large. Its primary markets include:

| | |
|---|---|
| Networks, such as: | FOX, ABC, CBS, NBC, ESPN, TNT, Discovery, etc. |
| Properties such as: | NFL, MLB, NASCAR, NBA, PGA, NCAA Athletics, etc. |
| Programs such as: | American Idol, Dancing with the Stars, Survivor, NCIS, etc. |
| Brands such as: | Coca-Cola, Budweiser, Proctor & Gamble, Geico, etc. |
| Agencies such as: | BBDO, Saatchi & Saatchi, McCann Erickson, etc. |

To maximize its reach, POPSY will also utilize its other proprietary technology – Event Cell-Sync at Live Sports and Entertainment venues that include such facilities as: College Sports stadiums and arenas, Professional Sports stadiums and arenas, Sports Bars, etc.

POPSY's business model addresses exactly what this industry is seeking:

- A direct, detailed and measurable link to its viewers and participants.
- To increase the bottom line for all involved: Networks/Properties, Programs, Brands and Agencies, and Facilities
- To provide Incentives/Rewards for viewers and fans to interact with programs and events

POPSY's founders have attracted some of the best talent from television, sports, brands and agencies to become part of its elite, dream team. They have the experience, the connections and the vision to bring the Company's goals to fruition.

11

# Product Description

POPSY is a new, innovative Smart phone application platform that provides interactivity between television networks/programs, Sports properties, advertisers and viewers ... an incredibly easy solution for implementing interactivity for television viewers and live event audiences.

With its proprietary TV Cell-Sync and Event Cell-Sync technologies, POPSY enables any Smart phone to interact with television programming and live events. TV broadcasters and live event venues use their existing technology without the need for additional hardware and/or software – this makes using POPSY's platform extremely cost-effective and easy to roll out nationally and globally.

Popsy users interact with programming or events in one of 3 ways: (see next pages for examples of each prompt)

**Visual Prompt** – Popsy users open up the Popsy web application on their Smart phone and click "Watching TV" or "At a Live Event". Next, they select the program or event that they are watching on TV or attending live. Since the Popsy system knows where they are from their Smart phone number, only Popsy enabled events or TV programs from their area code appear on the list to select from. In the case that a user is not in his/her registered locale, they select the "Change my Location" button, where they are asked to submit the area code of their current locale – the Popsy enabled programming for that locale then appears on the listing.

If the program or venue is using the Visual Prompt method, a sponsored logo appears on the Smart phone screen with instructions to click on that logo when it appears on the TV screen or the venue's Digital display. If the logo is pressed prematurely nothing appears on the phone screen since it is "synced" to the program or event. When it is pressed while being prompted by the logo on the TV screen or Digital display (Visual Trigger), a Popsy Challenge (predictive or recall question), Polling or Trivia question or Information piece appears on the user's Smart phone screen. The user then interacts with the screen as instructed. In the case of a Popsy Challenge, Polling or Trivia question Popsy Points are awarded for correct answers. (go to **Point System** for complete details)

When using Popsy for TV, the same visual prompts will appear during the sponsor's commercial. The user is instructed to click the sponsor's logo on the Smart phone during the commercial to collect Bonus Points and/or Instant Prizes. Sponsors also have the ability to place "Special Offers" on the phone screen after the user clicks during this bonus phase.

**Automatic Prompt** – When the use of a visual trigger is not possible, Popsy utilizes its "Push" technology to automatically send a time-synced Popsy Challenge, Polling or Trivia question or Information piece to the user's Smart phone screen. Instead of the user pressing on the sponsored logo screen for interaction (as in the Visual prompt method), the user waits for the questions or info to appear on his/her screen automatically. The appearance is accompanied by a buzz or ring on the phone which is employed to let the user know that a challenge or info piece has been displayed. In the background, POPSY'S software monitors and records every POPSY viewer response, creating POPSY'S Measurability Report. Unlike Nielsen's Ratings (its only competition in this area), who use assumptions, POPSY'S data is precise and real-time demographics that are essential to this marketplace.

**Open Prompt** – While watching live sporting events, Popsy, in addition to the Visual or Automatic prompt, can employ an "Open" prompt system which consists of a screen with selected choices on it that remain constant throughout the event. Users press one of the choices to predict an outcome. (i.e. for Baseball a user may predict that the next batter will get a DOUBLE by pressing that button just before the batter gets up). Upon submission of the choice, the screen reverts back to the choice screen and user can then make another prediction.

12

# Visual Prompt



1.) TV-Cell-Sync is Engaged.



2.) Popsy Icon and Notification



3.) Branded Identification

4.) Challenge Open for Popsy Play

# Automatic Prompt



15

# Open Prompt



16

# The POPSY Advantage

**To the Advertiser:**

- POPSY provides the reason for viewers to be attentive during programs and commercials
- Enhances brand recognition, and recall through viewer interactive engagement during commercial time
- Increases viewer loyalty using the POPSY REWARDS platform that aggregates points earned during interactivity
- Provides proof of viewership through viewer activity monitoring and data capture
- POPSY'S precise and real-time analytic reports provide vital network and advertising data
- POPSY technology provides networks and brands strong demographic information
- POPSY provides data on "out-of-home" interactivity from live events and Sports bars
- POPSY'S interactivity reports, including area-code and location based information, can be viewed live on POPSY'S website
- Additional opt-in viewer information will add further data to desired content
- POPSY'S reach is extended to live sports and entertainment venues so fans can interact during live games and performances
- Deployable nationwide...immediately

In addition, Mobile advertising provides:

- **10 times higher click-through rates than online advertising**
- **10 times higher aided brand awareness**
- **8 times higher unaided brand awareness**
- **6 times higher purchase intent**

**Source: Insightexpress**

**To Television Networks:**

- TV commercial "Up-Sell" for Interactivity will increase CPM yields which increases network profits
- POPSY is sponsored by broadcast and non-broadcast advertisers
- Networks use their *existing* broadcast hardware/software
- Real-time Interactive data of all POPSY-enabled activity
- POPSY'S precise analytic reports provide vital viewer data
- POPSY'S interactivity reports, including area-code and location based information, can be viewed live on POPSY'S website
- POPSY'S Platform can be used for "Live" or "Recorded" programming
- POPSY'S interactivity is the only solution to reach multiple viewers in one location...like a sports bar, for example
- POPSY'S reach is extended to sports and entertainment venues so fans can interact at live games and performances
- Uses proprietary "TV-Cell Sync" technology that eliminates the need for Cable/ Satellite integration
- Deployable nationwide...immediately

**To Viewers:**

- Provides TV program and live event interactivity using internet-enabled Cell/Smart phones
- POPSY'S Interactive Application is free
- Interactivity is rewarded through the "POPSY REWARDS" program – POPSY Point System
- Weekly, Monthly and Seasonal Prizes awarded for Top Scorers
- Viewers can track their rewards on their personal "POPSY" webpage
- POPSY'S Viewer Competition section allows viewers to set up weekly, monthly and/or seasonal competitions against other viewers or groups of viewers
- POPSY acts as a firewall between viewer and advertiser
- Viewers can "opt-in" for special deals from advertisers

## POPSY Point System – The Incentive:

Each time a viewer or fan interacts with POPSY, points are awarded. Incorrect responses receive the lowest amount of points (points for just clicking) while correct responses garner much higher point amounts.

Each property, program, advertiser and event will have their own point totals. The POPSY website organizes and segregates points earned and categorizes them according to the source that generated them.

Every property, program, advertiser and event will have point thresholds established which will dictate the redemption value of any members' points. For instance, the NFL competition may generate a $50 Visa Gift Card for a member that has reached the 5,000 point level, while the TV show Survivor may generate a $25 Gap Gift Certificate for members reaching the 5,000 point level. POPSY, the program or event and the advertisers will Co-op these prizes and provide rewards lists on POPSY's website so that members can monitor the value of points accumulated and where that value can be applied.

**Recapping:**

* **"Addressable advertising on television is in many ways the holy grail, because it can offer even more targeting ability than Google"**

       Craig Moffett, Senior Analyst
       Sanford C Bernstein & Company

*("addressable is the industry term for targeted advertising)

17

# How POPSY Generates Revenue

The Company has created 6 revenue streams for POPSY, thus far. They include:

## 1) Management Fees from Networks/Properties and Programs.

POPSY is designed to substantially increase the profits of Networks/Properties and Programs because of its addressable and measurable interactivity capabilities. Popsy will charge Networks/Properties and Programs a monthly management fee for updating Popsy interfaces and data modules to fit their specific program needs.

As interactivity increases viewership, Advertisers will pay a higher CPM.

POPSY intends to engage in exclusivities with Networks, Programs and Brands

## 2) Development Fees from Advertisers

Advertisers will pay POPSY Development Fees to:

- Design, implement and maintain POPSY 'prompts' (visual triggers) to alert viewers that their ad is about to air
- Provide them space on the Smart Phone to offer special deals, discounts, etc after a viewer clicks during one of their commercials
- Track all offers accepted and fulfilled
- Interface POPSY's Reward Program with their existing Rewards Programs

## 3) POPSY'S Measurability Reports

POPSY's analytics provide more accurate, pointed, exact backend data than Nielsen, our only competitor in this area.

Nielsen Ratings is currently paid $225,000 per year, per program for their analytics.

POPSY can command more dollars because it tracks precise measurability, with real numbers, in real time.

- Proof of viewership utilizing activity captured during programs and commercial breaks
- Precise measurability reports provide vital viewer data
- Measurability reports, including area-code and location based information, can be viewed live on POPSY'S website.

18

## 4) POPSY'S Website

It is anticipated that active viewers will check POPSY'S website often to see their points and rewards. This section of POPSY's website will be sponsored, earning advertising dollars, similar to the way Google™ earns ad revenue on their site.

## 5) POPSY's Proprietary Event-Cell-Sync Technology for Live, On-Site Events

POPSY will attend and engage fans to participate in fun and rewarding interactivity at sports games and other live events in much the same way as they would with TV except they interact by using their cell phones to respond to sponsored questions they see on the big screens at arenas, stadiums and other event facilities.

## 6) POPSY's Proprietary TV-Cell-Sync Technology for Broadcast TV events and programming

POPSY will integrate its platform with broadcast TV in the following segments and shows:

- Broadcast Sports
- TV Drama
- TV Reality
- TV Comedy
- Cable Sports
- Cable News
- Cable Talk Shows
- Cable Home Entertainment – cooking, home improvement, realty, travel, history and documentary

# Industry Overview

- **Television advertising is currently a $60 billion industry**
- Interactive Television (ITV) has been but a vision on the horizon for over a decade.
- Its major players have not been able to develop a mutually beneficial platform.
- **Brands are looking for more inventive and interactive ways to engage consumers, but have not been able to devise a solution to keep their interest and/or their participation.**
- Major networks have admitted that they cannot survive on the current level of advertising revenue.
- **Quasi-interaction via cell text messaging not only costs viewers to participate but is losing its appeal, overall.**

Current agreements allow **cable companies to sell on average 2 minutes of local advertising** on a full hour program. They are not permitted to overlay interactivity on a network feed. **Popsy's platform targets between 15 – 18 minutes of all advertising in a programming hour.**

To try to capitalize on interactive TV, the six largest cable companies formed **Canoe Ventures** (formally called Project Canoe) **to:**

- Find ways that allow national advertisers to buy targeted, interactive ads across cable companies' systems, during their allotted 2 minutes of a full hour program.
- Possibly grow their current annual $5 billion revenue from local ads to $15 billion by adding national interactive ads.

To make this happen, a huge investment of time and money is being spent to install compatible hardware and software in all the cable companies, nationwide. They are using a protocol called EBIF (Enhanced TV Binary Interchange Format) for uniformity.

EBIF is a <u>CableLabs</u>-specified platform that enables cable company programmers to deliver simple interactive applications across cable's entire universe of digital cable set-tops, including older, low-end models such as the <u>Motorola Inc.</u> (NYSE: <u>MOT</u>) DCT2000, and newer, more powerful boxes based on tru2way.

EBIF applications fall into two categories: "bound" and "unbound." **Bound** EBIF applications, such as viewer voting and polling, are synched with the live programming. **Unbound** EBIF apps include some simple games and "widgets" that provide personalized information such as news, weather, and sports scores.

Apps in both categories are "triggered" by the viewer via the remote control. At last check, there are about seven EBIF "players" (the client that resides on the set-top) in the market today. *Nuances in those interpretations of the EBIF spec may make it more difficult for developers to build applications for different environments without going through another layer of interoperability testing.*

To reiterate, the EBIF protocol, used through set-top-boxes, is navigated by a single user/viewer using the one and only remote control designated to the set-top-box.

The major barrier blocking Canoe from easily going forward are the ever-present politics between networks, programs and cable companies.

Nielsen is the only tool used by the industry to measure TV audiences. The following description was taken directly from Nielsen's website:

*Nielsen's National Sample – To measure the national TV audience. Nielson uses a statistically selected sample of more than 9,000 households, containing over 18,000 people who have agreed to participate.

Nielsen's Local Sample – Nielsen measures 210 local television markets, called DMA (Designated Market Area) regions. Of these, the 56 largest are measured by meter technology. The remaining smaller markets are measured by paper diaries only.

## Market Research

As the following facts and statistics reflect, the market is ripe, willing and able to accept and adopt the use of POPSY to interact with television programs and their sponsors.

**Smart Phones**

The combination of smart phones and useful and entertaining mobile applications has sparked a technology revolution, changing the way that consumers interact with and use their mobile phones. Downloads from all app stores will reach 6.67 billion applications by 2014, up from two billion this year, according to market research firm *Frost & Sullivan*. As of August this year the Apple App Store boasted more than one billion downloads with 65,000 mobile apps available. Most smartphone users (62 percent) download one to five applications per month, and the share of iPhone users in the same category is even higher, at 82 percent, according to *Goldman Sachs*.

In parallel, analysts are predicting aggressive growth of the smartphone market due to competition and price slashing. The following page contains the most recent projections by Nielsen for smartphone penetration in the U.S. mobile phone marketplace.

**Feature Phones–Internet and Cell phone Usage of Americans**

38% Americans watch Television shows online
36% use Cellphones for entertainment purposes
45% are involved in creating Social web content
62% of millennials(13-24 years) use cellphones as entertainment devices
20% of the people watch video content on the cellphones almost everyday
54% of the population socialize through the Social networking websites

Source : Hollywood reporter

21

# Nielsen Smart Phone Projections

## Nielsen: US Smartphone Penetration to Be over 50% in 2011

Market research firm Nielsen said today it forecasts more smartphones than feature phones in the U.S. market by the end of 2011.

According to Nielsen, as of the fourth quarter 2009, 21% of American wireless subscribers were using a smartphone compared to 19% in Q3 2009 and 14% at the end of 2008.

"The share of smartphones as a proportion of overall device sales has increased to 29% for phone purchasers in the last six months and 45% of respondents indicated that their next device will be a smartphone", explained the research firm. "If we combine these intentional data points with falling prices and increasing capabilities of these devices along with a explosion of applications for devices, we are seeing the beginning of a groundswell. This increase will be so rapid, that by the end of 2011, Nielsen expects more smartphones in the U.S. market than feature phones."



## U.S. Smartphone Penetration & Projections

## POPSY's Competitive Advantage

- POPSY's proprietary TV-Cell-Sync and Event-Cell-Sync technology is like no other. It is a unique, economically sound, and easy solution for interactive television.
- Cost effective—No additional hardware or software is needed by viewers, networks/properties, programs, brands, agencies, cable or satellite companies.
- Using POPSY's proprietary TV-Cell-Sync technology eliminates the need for cable/satellite integration. Networks use their existing hardware/software.
- POPSY can be sponsored by broadcast and non-broadcast advertisers.
- POPSY's platform can be used for "Live" or "Recorded" programs.
- POPSY's Measurability Reports are in real-time, providing precise demographics based on area-code and location and can be viewed live on POPSY's website.
- Easy market penetration--no need to negotiate or deal with the politics between the networks, programs and the cable and/or satellite companies
- Turnkey deployment—Viewers can instantly engage with POPSY Interactive, using Smart phones.
- Strong launch strategy—immediate deployment, nationally.
- POPSY's interactivity is the only solution to reach multiple viewers in one location...like a sports bar or live event, for example.
- Most importantly, POPSY is designed to substantially increase the profits of Networks/Properties and Programs because of its addressable and measurable interactivity capabilities.

## Marketing and Sales Plan

**Marketing:**

An experienced and effective marketing team will:

- Establish POPSY'S brand through a strong, six-month advertising campaign in such publications as:

  *Sports Business Journal*
  *Advertising Age*
  *MultiChannel News*

- Launch a three-month public relations campaign in the mainstream media (i.e., TV News, Publications, Newspapers, Websites, Social Networks including FaceBook, LinkedIn, Twitter, etc).

- Participate, host and speak at relevant trade shows

- Publicize POPSY at live sports and entertainment venues with sponsored POPSY Interactivity, viewed on the big screens at arenas, stadiums and other facilities, by thousands of avid fans. This marketing approach will fast-track viewership participation and generate revenues at the same time.

23

**Sales:**

POPSY's sales team and contracted agency sales representatives will sell POPSY to social establishments, networks, sports and entertainment stadiums and arenas.

Sales campaign will commence immediately after the beta test provides Popsy's Proof of Concept. The initial focus will be on:

Sports Bars - Buffalo Wild Wings, Hooters, TGIF's, etc.

Networks -- FOX, ABC, NBC, CBS, ESPN, TNT, Discovery, etc.

Properties -- NFL, MLB, NASCAR, NBA, PGA, NCAA Athletics, etc.

Programs -- American Idol, Dancing with the Stars, Survivor, NCIS, etc.

Brands -- Coca-Cola, Geico, Budweiser, Proctor & Gamble, etc.

Agencies -- BBDO, Saatchi & Saachi, McCann Ericson, etc.

Facilities -- Cowboys' Stadium, Yankee Stadium, Staples Center, College Stadiums, etc.

24

25

# POPSY'S Development Phases

**Phase One:**

- POPSY's proprietary TV-Cell-Sync feature to be deployed in 50 regional Sports Bars to test and monitor new member acquisition rates, actual Smart phone penetration rates, market acceptance, ease of use, effectiveness of advertising and member interactivity.
- OCTOBER, 2010

**Phase Two:**

- POPSY's proprietary Event-Cell-Sync for live sports and entertainment venues deployed to facilities and franchises.
- NOVEMBER, 2010

**Phase Three:**

- POPSY's proprietary TV-Cell-Sync feature to be deployed, on limited basis, to the NFL and NBA
- MAY, 2011

**Phase Four:**

- Full roll-out of POPSY's proprietary TV-Cell-Sync feature to MLB
- International distribution of TV-Cell-Sync and Event-Cell-Sync for television and live events commenced
- APRIL, 2011

**Phase Five:**

- Full roll-out of POPSY's proprietary TV-Cell-Sync feature broadcast TV programming
- International distribution of TV-Cell-Sync and Event-Cell-Sync for television and live events in full rollout
- OCTOBER, 2011

## POPSY Organization

Technology Development Team
Creative Team
Marketing Team (Branding and Advertising)
Sales Team
Partnership Team (Networks/Properties, Programs, Brands and Agencies
Viewer/POPSY Participation Team (Website, rewards, etc.)
Live, On-Site Event Team (sports and entertainment franchises and facilities)
Human Resources
Quality Control
Corporate Headquarters

## POPSY'S Management Team

Ryan Kurek, Co-Founder & CEO, is considered one of the most creative and strategic leaders in sports and entertainment.

From his professional start at Rockwell Automation, Kurek developed an innovative B2B sponsorship and vendor-supplier platform that subsidized 80% of their activation costs for ten years. In addition, Kurek directed the sponsorship and marketing efforts for Bayer, Closetmaid and General Electric with unique cross channel success.

Under Mr. Kurek's guidance, his firm, LVRG Marketing & Media, was elevated from a one person consulting gig into the most innovative branding agency in the industry.

Advancing LVRG's position in sports and entertainment, Kurek secured Phunware, the market leader in iPhone / iTouch applications, as its agency of record. Responsible for brand extension, LVRG is leading the branded utility and tutorial applications within sports, lifestyle and entertainment.

Kurek launched into media with long-time friend and business advisor Steve Pruett to develop the creative and marketing models for their motorsports show 3 Wide Life. Kurek and Pruett filled a void in syndicated programming that is now being replicated throughout sports programming. As Executive Producer, Kurek has led the show to the #1 aired motorsports show in the country, airing on 198 platforms in more than 65 million homes in just two years. In January, 2010, 3 Wide Life was picked up by the Speed Channel...whose viewership tops over 81 million viewers a week.

This success in media and marketing landed LVRG as the marketing, creative and revenue consultant to media giant Communications Corporation of America (CCA). A $70 million business operating FOX, NBC and CBS stations in three states, LVRG developed marketing monetization platforms for stations' events, promotions and programming which substantially increased CCA's nontraditional revenue across its business platform.

Kurek then developed CCA's multimedia platform and revenue models to help position the organization for future growth within the ever changing media industry. Additionally, he helped create localized affinity programming utilizing his monetization model.

26

Kurek graduated Clemson University with a Bachelors of Science in Marketing from the College of Business and Behavioral Science, with a minor in Political Science. He is currently a Board of Advisor member of the Clemson University Marketing Department, Center for the Advancement of Marketing and Social Science and the St. Jude Children's Hospital Sports Advisory Board.

Featured in the textbook Business Marketing Management, Kurek has also been sourced in Sports Business Journal, Sports Business Daily, Brandweek, Promo Magazine, Charlotte Business Journal, North Carolina Motorsports Association, ESPN, Speed Channel, NASCAR.com and Fox Sports. With more than 65 published papers on marketing and media, and the creator of the Motorsports Marketing Report and Marketing and Media Report which are circulated to more than 1,350 sports and brand leaders, Kurek is also a member of more than 15 professional organizations in sports, marketing and media.

A native of Point Pleasant Beach, New Jersey, Kurek resides just outside of Charlotte, North Carolina.

Peter M. Redling, Co-Founder, Managing Director, Inventor, started as a commodities clerk on COMEX in the mid-70's. After just 2 short years as a clerk, mainly because of his organizing and innovation skills, he was made a floor supervisor of all COMEX floor operations for E.F. Hutton. In 1977 he was made supervisor of all NY commodities floor operations in the newly launched Commodities Exchange Center at 4 World Trade Center, NYC. During that time, he created and successfully tested his uniquely designed technical analysis trading system.

In 1980, Mr. Redling bought a seat on the COMEX to launch his independent floor broker operation where he implemented his trading system into the services he provided that provided to domestic and international trading institution throughout important trading centers including Europe, the Middle East and Asia.

In 1992, Mr. Redling left the trading floor to concentrate on furthering his technical analytical development and to pursue business in the fledgling "Internet" marketplace, while still advising selected financial clients.

In 1993, Mr. Redling and Jackie Skipper Barrios combined their experience with electronic data formation and distribution to explore new business opportunities within the World Wide Web. In 1996, they formed GEDI Systems Inc., to create and develop innovative software applications that combine television and the Internet. By 1998, the principals at GEDI focused their concentration on the interactive television market.

In 2004 they formed Your Choice Interactive, Inc (YCI) to further develop their cutting edge interactive television applications. In 2007, YCI was granted a very important and valuable patent on its Interactive Television Advertising Method.

By 2009, interactive television progressed from years of design, development and testing to slowly becoming available on the TV sets of America's home market. Mr. Redling saw an opportunity that would expedite the iTV experience by inventing an application that would enable Internet enabled cell phones to emulate a remote control. To bring this new innovation to market, Mr. Redling and Ms Barrios formed Popsy Interactive Inc.

27

**Ms. Jackie Skipper Barrios, Co-Founder, Managing Director,** has more than 30 years of experience in creating new concepts, launching new businesses, successfully selling their products and has played a huge part in the mergers and acquisitions of these businesses.

MS Barrios started her career in 1975 at *Institutional Investor Magazine....*a leading global journal for investment professionals...as Assistant to the Editor, handling the editorial operation.

In 1978, MS Barrios helped to create, design and develop *The Corporate Finance Sourcebook* which became one of the most relied on source books of its kind and was ultimately sold to Macmillan Publishing.

In 1981, she joined Telerate Systems Inc.—one of the first interactive data systems to serve the professional trading community. She increased its subscriber base from 3,000 to 150,000 domestic and international financial institutions. Five years later, she helped to establish its Canadian partner, CMC's presence in the U.S., opened its headquarters, set up the sales operation and handled its sales...she ultimately helped to broker CMC's sale to Telerate. Telerate was bought in 1988 by Dow Jones. Her sales efforts increased the company's revenues by an average of $10 million annually.

MS Barrios and Peter Redling partnered in 1996 to form GEDI Systems Inc. to design interactive television (ITV) applications, using the internet and broadcast television. They applied for a patent in 1998.

By 2004, they formed Your Choice Interactive Television Inc. (YCI) to further develop Interactive TV applications. They created the first NY Racing Board approved interactive TV off-track betting platform. They simultaneously worked with Cablevision for three years on interactive television user applications.

In 2009, MS Barrios and Mr. Redling extended their initiatives to use smart phones to interact with TV, live events and social establishments. Popsy Interactive Inc. was formed in December, 09, to launch this effort.

**Firoz A. Shaikh, MBA, CPA, Co-Founder, Chief Financial Officer,** has served as a Certified Public Accountant since 1987, handling audits, reviews, taxation and financial planning for a diverse client base. He has extensive experience in multi-national accounting and tax set-up, financial planning and budgeting.

Mr. Shaikh has worked with various start-up companies in the technology, education and trading fields and has laid their foundation for rapid growth. He has also created management strategies for a medical college and a charter airline company. He has experience in crisis management and turnaround strategy.

Mr. Shaikh has developed an extensive and invaluable network of prominent contacts in the U.S., Middle East, South Asia and Europe. He is very active in community affairs and good will efforts, while maintaining an entrepreneurial base of work.

Mr. Shaikh, Mr. Redling and Ms Barrios have been partners since 1996.

**Tom Issing, Director of Strategic Partnerships,** has 23 years of experience building new concepts, business relationships and successful businesses both domestically and abroad. He is recognized as a consummate professional, known for his contagious passion for excellence and a talent for resourceful business solutions.

He started at Cantor Fitzgerald in 1987 as Vice President of Government Bonds. Mr. Issing managed accounts with trading volumes exceeding $650mm a day. He advised trading strategies utilizing swaps, futures, options and other derivative products. He also expanded their international client base and enhanced client relations when becoming VP, Non-Dollar Government Bonds for Cantor Fitzgerald International, U.K., London. While in that position, he founded their Proprietary Brokerage Desk, achieving increased revenues monthly.

At the same time, as a side line, Mr. Issing became Proprietor of the First Avenue Pub in NYC. He increased business 300% from date of purchase. He also designed and directed the conversion of a retail property to a full service commercial kitchen, recruited and managed a staff of 20, as an upscale prepared food business, directed and managed inventory procurement. In total, the two start-up food and beverage businesses achieved annual sales of more than $2.5mm.

**David Aregood, Executive Vice President, Sales and Marketing,** has 14 years of experience in a sales and marketing executive within the technology-driven media industry. David's expertise lies in sales channel development, new media business development, marketing and brand integration, strategic planning, and selling advertising solutions to cable and satellite operators. Throughout his career, David has worked with some of the top cable networks including, TV Guide Interactive (Gemstar), Great American Country (Scripps) and Starz Entertainment Group (Liberty Media).

During his tenure he has worked alongside some of the top MSO's including Time Warner, Cox Communications, Bresnan, Comcast and Adelphia as well as Telcos, Big Box Retailers and satellite partners, DIRECTV and DISH Network.

Currently, David is an independent business owner with LIFT Network. David advises local and regional retailers on utilizing new technologies to drive retail sales. He consults businesses on the use of Mobile Marketing (SMS Text), Email Marketing, Local Search Marketing and Gift/Rewards to connect, and increase the frequency of sale opportunities.

Mr. Aregood is actively involved in the community and has served on the board of the Colorado Junior Chamber of Commerce both as Director and as Membership Vice President. He has been honored with many awards, including the C. William Brownfield Memorial Award. He has maintained active membership with many cable associations including WICT, CTAM, and NAMIC.

David attended Clemson University where he earned a bachelor degree in Business Management. He currently resides in Littleton Colorado with his wife, Jennifer and their daughters Baylee and Addison.

29

## POPSY'S Board of Advisors

**Steve Pruett, Advisor, Television Networks.** As the CEO of Communications Corporation of America, Steve Pruett is considered as one of the most innovative multimedia pioneers in the television industry. In addition to his partnership with Ryan Kurek on 3 Wide Life, Mr. Pruett advises LVRG and its clients on the media industry, including rights, partnership, distribution and content.

Mr. Pruett began his career as a specialist in sports television at Petry and MMT National Sales. He transitioned this experience into media ownership with the purchase of a number of television and radio stations over the course of his career. Responsible for personally negotiating many rights deals in the broadcast industry, Mr. Pruett came to understand the intrinsic value of sports and lifestyle properties to both the broadcaster and sponsor.

As one of the earliest affiliates of the FOX network, Mr. Pruett discovered firsthand the impact branded sports content had on building the FOX network into a powerhouse. Mr. Pruett is also a renown advisor in the media industry, consulting corporations on media property development including, DirecTV, Thomson Consumer Electronics (RCA), NBC, GE, FOX and Warner Bros.

Mr. Pruett has taken CCA to the pinnacle of the mid-market television industry in America, consisting of 26 stations in 10 markets throughout Texas, Louisiana and Indiana. He has successfully grown the organization into a $70 million organization and is poised to increase its footprint and revenue amazingly in this down economy. In addition to many innovative processes, Mr. Pruett is transforming CCA into a full service local multi-media organization.

A FOX Television Board Governors Member, a MBA graduate from the J.L. Kellogg Graduate School of Management at Northwestern University and undergraduate at SIU-Edwardsville studying radio and television, Mr. Pruett resides in both Lafayette, Louisiana and Carefree, Arizona with his wife Paula.

**Maher Kawar, Advisor, Media Expert,** has more than 14 years experience in entertainment marketing, sales and production. His career began as a marketing coordinator and he worked his way up the ranks to run the entire western region for companies such as College Sports TV and Comedy Central. Mr. Kawar has worked with other major companies such as BET, TV Guide, and NBC Universal (formerly USA Networks).

Mr. Kawar has also worked as a producer in philanthropic endeavors. He is the creator and producer of the Evening with the Stars. This annual red carpet event is attended by over 75 daytime celebrities, media and fans, and has raised over $100,000 to benefit the Desi Geestman Foundation, devoted to pediatric cancer.

**Wade Leaphart, Director of Property Sales.** 10 years of experience in sports and facility sales and marketing, including the NBA, NASCAR and the NHL.

**Ragnar Meltern, Speical Advisor, Media Investments, Capital Raise, Mergers and Acquisitions,** is currently the Managing Director, Head of Telecoms, Media and Technology Banking for Standard Chartered Bank in Dubai, responsible for emerging markets in Europe, Middle East and Africa. Mr Meltern has more than 14 years of experience in investment banking advisory and capital raising. Experience and vast global resources for new business development and integration.

31

**APPENDIX**

# U.S SPORTS

# MARKET STATISTICS

## Sports Industry Overview

| | Amount | Units | Year | Source |
|---|---|---|---|---|
| Estimated Size of the Entire Sports Industry, US | 410.6 | Bil. US$ | 2009 | PRE |
| Annual Company Spending for Sports Advertising, US | 30 | Bil. US$ | 2009 | PRE |
| **Major League Baseball (MLB)** | | | | |
| MLB League Revenue | 6.2 | Bil. US$ | 2009 | PRE |
| Overall Operating Income | 501 | Mil. US$ | 2008 | Forbes |
| Number of MLB Teams | 30 | Teams | 2009 | MLB |
| Average MLB Game Attendance (162 Game Season) | 32,516 | Spectators | 2008 | ESPN |
| Average MLB Team Value | 482 | Mil. US$ | 2008 | Forbes |
| **National Football League (NFL)** | | | | |
| NFL League Revenue | 6.0 | Bil. US$ | 2009 | PRE |
| Overall Operating Income | 790 | Mil. US$ | 2008 | Forbes |
| Number of NFL Teams | 32 | Teams | 2009 | NFL |
| Average NFL Game Attendance (16 Game Season) | 68,034 | Spectators | 2008 | ESPN |
| Average NFL Team Value | 1.0 | Mil. US$ | 2008 | Forbes |
| **National Basketball Association** | | | | |
| NBA League Revenue (Basketball Related Income) | 3.2 | Bil. US$ | 2008/09 | PRE |
| Overall Operating Income | 318 | Mil. US$ | 2007/08 | Forbes |
| Total Value of Media Contracts | 7.4 | Bil. US $ | 2008/09-15/16 | Forbes |
| Number of NBA Teams | 30 | Teams | 2008/09 | NBA |
| Average NBA Game Attendance (82 Game Season) | 17,497 | Spectators | 2007/08 | ESPN |
| Average NBA Team Value | 379 | Mil. US$ | 2007/08 | Forbes |

32

## National Hockey League

| | | | |
|---|---|---|---|
| NHL League Revenue | 2.4 | Bil. US$ | 2008/09 | PRE |
| Overall Operating Income | 141 | Mil. US$ | 2007/08 | Forbes |
| Number of NHL Teams | 30 | Teams | 2008/09 | NHL |
| Average NHL Game Attendance (82 Game Season) | 17,476 | Spectators | 2008/09 | ESPN |
| Average NHL Team Value | 220 | Mil. US$ | 2007/08 | Forbes |

## Sporting Equipment Sales

| | | | |
|---|---|---|---|
| Revenues, U.S. Sporting Goods Manufacturers.* | 66.3 | Bil. US$ | 2008 | SGMA |
| Retail Sporting Equipment Sales | 42 | Bil. US$ | 2009 | PRE |

## Other Sports Industry Revenue

| | | | |
|---|---|---|---|
| Other Spectator Sports Leagues | 3.3 | Bil. US$ | 2009 | PRE |
| Horse Racing | 8 | Bil. US$ | 2009 | PRE |
| Golf Courses | 19.5 | Bil. US$ | 2009 | PRE |
| Fitness & Recreational Centers | 20 | Bil. US$ | 2009 | PRE |
| Other Amusement & Recreation | 19 | Bil. US$ | 2009 | PRE |
| Other Revenues Associated With U.S. Sports Industry** | 165 | Bil. US$ | 2009 | PRE |

* Includes sporting goods equipment, sports apparel, fitness equipment, recreational transport equipment and athletic footwear.
** All other revenues, including peripheral revenue such as sports-related publishing, facility construction, food service, licensing, sponsorships, travel, gambling, etc., estimated at 38.95% of all sports revenue.

Source: Plunkett Research, Ltd. Copyright© 2009, All Rights Reserved

Plunkett's Sports Industry Almanac 2010

# BROADCAST TV AD REVENUE STATS

## 3rd QUARTER 2009 SUMMARY
### ($000)

|  | 3rd Qtr 2009 | 3rd Qtr 2008 | % Change |
|---|---|---|---|
| Spot TV* | 3,119,714.9 | 4,336,851.7 | -28.1 |
| Syndication | 1,022,248.4 | 1,101,120.4 | -7.2 |
| Network TV | 4,656,588.8 | 5,931,483.2 | -21.5 |
| Total Broadcast TV | 8,798,552.1 | 11,369,455.3 | -22.6 |

## JAN-SEPT 2009 SUMMARY
### ($000)

|  | Jan-Sept 2009 | Jan-Sept 2008 | % Change |
|---|---|---|---|
| Spot TV* | 8,659,740.9 | 11,924,769.8 | -27.4 |
| Syndication | 3,208,224.7 | 3,301,801.5 | -2.8 |
| Network TV | 17,033,481.3 | 19,072,455.5 | -10.7 |
| Total Broadcast TV | 28,901,446.9 | 34,299,026.8 | -15.7 |

*Includes both local and national spot activity in the 100+ markets measured by TNS/MI.

Copyright 2008, 2009. TNS Media Intelligence

34

# Cable Advertising Revenue

## (in millions)

| Year | Cable Networks | Local/Spot Ads | Reg. Sports Nets | Total Ad Revenue |
|------|----------------|----------------|------------------|------------------|
| 1999 | $8,876 | $2,667 | $436 | $11,978 |
| 2000 | $10,447 | $2,879 | $425 | $13,805 |
| 2001 | $10,336 | $2,860 | $442 | $13,726 |
| 2002 | $10,812 | $3,294 | $455 | $14,705 |
| 2003 | $12,294 | $3,354 | $488 | $16,370 |
| 2004 | $13,867 | $3,807 | $542 | $18,551 |
| 2005 | $15,771 | $3,978 | $599 | $20,816 |
| 2006 | $17,331 | $4,236 | $682 | $22,881 |
| 2007 | $19,600 | $4,713 | $749 | $25,062 |
| 2008 | $21,425 | $4,343 | $852 | $26,620 |

**Source:** National Cable & Telecommunications Association

35

36

# Financial Projections & Roll Out

# Year 1

## POPSY INTERACTIVE CORP
### Revenue Projection for June 2010 to May 2011

_Note: "Alpha tests" indicated over AUG 10 and SEP 10 columns._

| Description | JUN 10 | JUL 10 | AUG 10 | SEP 10 | OCT 10 | NOV 10 | DEC 10 | JAN 11 | FEB 11 | MAR 11 | APR 11 | MAY 11 | ANNUAL TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues (in US Dollars)** | | | | | | | | | | | | | |
| Sports Bar Revenue (Push Cell-Sync) | | | | | 15,000 | 45,000 | 30,000 | 90,000 | 67,500 | 180,000 | 180,000 | 180,000 | 787,500 |
| Live Event Revenues (Live Cell-Sync) | | | | | | 9,000 | 18,000 | | 2,550 | 2,550 | 9,550 | 10,315 | 53,965 |
| TV Sports Revenue (TV Cell-Sync) | | | | | | | | | | | | 44,800 | 44,800 |
| TV Program Revenue (TV Cell-Sync) | | | | | | | | | | | | | |
| Other Revenues | | | | | | | | | | | | | |
| **TOTAL INCOME** | | | | | 15,000 | 54,000 | 48,000 | 90,000 | 70,050 | 182,550 | 189,550 | 235,115 | 894,265 |
| **Expenses (in US Dollars)** | | | | | | | | | | | | | |
| Smartphone and Database Programming | | | | | 10,000 | 10,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 93,000 |
| Executive Compensation | | | | | 18,000 | 18,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 162,000 |
| Staff Salaries | | | | | 5,000 | 5,000 | 5,000 | 7,500 | 7,500 | 10,000 | 10,000 | 10,000 | 60,000 |
| Marketing & Sales Executives | | | | | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 10,000 | 10,000 | 65,000 |
| Backoffice Programming Expense | | | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 16,000 |
| Employee Benefits + Payroll Tax | | | | | 10,200 | 10,200 | 11,400 | 12,000 | 12,000 | 12,600 | 13,200 | 13,200 | 94,800 |
| Executive Performance Bonus | | | | | | | | | | | | | |
| Media, Control and Cell Center | | | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 16,000 |
| **General and Overhead Expenses** | | | | | | | | | | | | | |
| Advertisement | | | | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 40,000 |
| Sales Commissions | | | | | 1,125 | 4,050 | 3,600 | 6,750 | 5,254 | 13,691 | 14,216 | 17,684 | 66,320 |
| Office Expenses | | | | | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 9,600 |
| Outside Consulting | | | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 16,000 |
| Printing and Reproduction | | | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 16,000 |
| Professional Fees Legal/Accounting | | | | | 10,000 | 10,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 27,500 |
| Rent | | | | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 20,020 |
| Shows and Exhibitions | | | | | | | | | | | | | |
| Telephone | | | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 18,000 |
| Travel and Entertainment | | | | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 5,000 | 5,000 | 5,000 | 27,300 |
| Utilities | | | | | 1,200 | 1,200 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 16,800 |
| Miscellaneous | | | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 16,000 |
| Total General and Overhead Expenses | | | | | 31,535 | 26,950 | 27,700 | 30,850 | 29,354 | 40,391 | 49,816 | 44,284 | 271,720 |
| **Total costs** | | 0 | 0 | 0 | 86,225 | 81,650 | 88,600 | 94,850 | 93,354 | 107,391 | 111,016 | 134,484 | 772,520 |
| **EBITDA** | | 0 | 0 | 0 | (71,225) | (27,650) | (40,600) | (4,850) | (23,304) | 75,159 | 78,534 | 120,681 | 106,745 |
| Corporate Tax rate | | | | | | | | | | | | | |
| Corporate Tax | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42,238 | 42,238 |
| **Net Income** | | 0 | 0 | 0 | (71,225) | (27,650) | (40,600) | (4,850) | (23,304) | 75,159 | 78,534 | 152,920 | 148,984 |
| **INVESTORS CAPITAL** | | | 225,000 | | | | | | | | | | 225,000 |
| **NET CASH FLOW** | | | 225,000 | 225,000 | 159,775 | 126,125 | 85,525 | 80,675 | 57,371 | 132,530 | 211,064 | 373,984 | 373,984 |

# Year 2

## POPSY INTERACTIVE CORP
### Revenue Projection for June 2011 to May 2012

| Description | JUN 11 | JUL 11 | AUG 11 | SEP 11 | OCT 11 | NOV 11 | DEC 11 | JAN 12 | FEB 12 | MAR 12 | APR 12 | MAY 12 | ANNUAL TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues (In US Dollars)** | | | | | | | | | | | | | |
| Sports Bar Revenues (Dual Cell-Sync) | 120,000 | 120,000 | 120,000 | 720,000 | 960,000 | 1,200,000 | 1,200,000 | 960,000 | 720,000 | 720,000 | 960,000 | 720,000 | 8,520,000 |
| Live Event Revenues (Live Cell-Sync) | 64,500 | 78,550 | 115,000 | 217,960 | 159,720 | 138,870 | 158,700 | 97,500 | 91,530 | 114,600 | 204,490 | 209,820 | 1,651,280 |
| TV Sports Revenue (TV Cell-Sync) | 94,400 | 94,400 | 306,400 | 1,650,400 | 1,808,800 | 1,612,800 | 1,984,000 | 1,868,800 | 830,400 | 998,400 | 1,845,600 | 1,276,800 | 13,971,200 |
| TV Programming Revenue (TV Cell-Sync) | | | | | | | | | | | | | |
| Other Revenues - | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **TOTAL INCOME** | 278,900 | 292,990 | 541,400 | 2,588,360 | 2,928,520 | 2,951,670 | 3,342,790 | 2,926,300 | 1,641,930 | 1,853,000 | 2,510,090 | 2,206,620 | 24,142,480 |
| | | | | | | | | | | | | | |
| **Expenses (In US Dollars)** | | | | | | | | | | | | | |
| Smartphone, Web and Database | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| Programming Compensation | 20,000 | 20,000 | 20,000 | 25,000 | 25,000 | 25,000 | 30,000 | 30,000 | 30,000 | 40,000 | 40,000 | 40,000 | 345,000 |
| Executive Compensation | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 210,000 |
| Staff Salaries | 10,000 | 10,000 | 10,000 | 15,000 | 15,000 | 15,000 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 210,000 |
| Marketing & Sales Executives | 4,000 | 4,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 58,000 |
| Backoffice Programming Expense | 12,800 | 12,800 | 13,000 | 15,000 | 15,000 | 15,000 | 18,500 | 18,500 | 18,500 | 20,500 | 20,500 | 20,500 | 200,600 |
| Employees Benefits + Payroll Tax | | | | | | | | | | | 127,680 | | 127,680 |
| Executive Performance Bonus | | | | | | | | | | | | 127,680 | 127,680 |
| | | | | | | | | | | | | | |
| Media, Control and Call Center | 15,000 | 16,500 | 18,150 | 19,965 | 21,962 | 24,158 | 26,573 | 29,231 | 32,154 | 35,369 | 38,906 | 42,797 | 320,764 |
| | | | | | | | | | | | | | |
| **General and Overhead Expenses** | | | | | | | | | | | | | |
| Advertisement | 15,000 | 15,000 | 20,000 | 35,000 | 40,000 | 40,000 | 25,000 | 25,000 | 20,000 | 15,000 | 15,000 | 15,000 | 280,000 |
| Sales Commissions | 20,918 | 21,968 | 40,695 | 194,127 | 227,139 | 221,375 | 250,709 | 219,473 | 123,145 | 137,475 | 188,257 | 165,497 | 1,810,686 |
| Office Expenses | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| Outside Consulting | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 |
| Printing and Reproduction | 4,000 | 4,000 | 4,840 | 5,324 | 5,856 | 6,442 | 7,086 | 7,795 | 8,574 | 9,432 | 10,375 | 11,412 | 85,537 |
| Professional Fees Legal/Accounting | 5,000 | 5,500 | 6,050 | 6,655 | 7,321 | 8,053 | 8,858 | 9,744 | 10,718 | 11,790 | 12,969 | 14,266 | 106,921 |
| Rent | 2,500 | 2,750 | 3,025 | 3,328 | 3,660 | 4,026 | 4,429 | 4,872 | 5,359 | 5,895 | 6,484 | 7,133 | 53,461 |
| Shows and Exhibitions | | | | 20,000 | | | | 20,000 | | | 20,000 | | 60,000 |
| Telephone | 2,000 | 2,200 | 2,420 | 2,662 | 2,928 | 3,221 | 3,543 | 3,897 | 4,287 | 4,716 | 5,187 | 5,706 | 42,769 |
| Travel and Entertainment | 3,000 | 5,000 | 5,500 | 6,050 | 6,655 | 7,321 | 8,053 | 8,858 | 9,744 | 10,718 | 11,790 | 12,969 | 95,656 |
| Utilities | 1,200 | 1,320 | 1,452 | 1,597 | 1,757 | 1,933 | 2,126 | 2,338 | 2,572 | 2,830 | 3,112 | 3,424 | 25,661 |
| Miscellaneous | 2,000 | 2,200 | 2,420 | 2,662 | 2,928 | 3,221 | 3,543 | 3,897 | 4,287 | 4,716 | 5,187 | 5,706 | 42,769 |
| **Total General and Overhead Expenses** | 65,618 | 66,398 | 92,312 | 283,405 | 304,244 | 301,591 | 320,947 | 309,571 | 155,686 | 209,571 | 265,862 | 269,112 | 2,681,605 |
| | | | | | | | | | | | | | |
| **Total costs** | 153,418 | 159,638 | 188,462 | 393,370 | 416,206 | 415,749 | 457,920 | 453,105 | 338,840 | 367,940 | 427,268 | 561,589 | 4,333,504 |
| | | | | | | | | | | | | | |
| **EBITDA** | 125,483 | 133,263 | 352,938 | 2,194,990 | 2,612,314 | 2,535,921 | 2,884,870 | 2,473,195 | 1,303,090 | 1,465,060 | 2,082,822 | 1,645,031 | 19,808,976 |
| Corporate Tax rate | 35% | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Corporate Tax | 43,919 | 46,642 | 123,528 | 768,247 | 914,310 | 897,572 | 1,009,704 | 865,618 | 456,081 | 512,271 | 728,988 | 575,761 | |
| | | | | | | | | | | | | | |
| Net Income | 81,564 | 86,621 | 229,410 | 1,426,744 | 1,698,004 | 1,648,349 | 1,875,165 | 1,607,577 | 847,008 | 952,789 | 1,353,834 | 1,069,270 | 12,975,355 |
| | | | | | | | | | | | | | |
| Beginning Cash | 373,984 | | | | | | | | | | | | 373,984 |
| | | | | | | | | | | | | | |
| **NET CASH FLOW** | 455,547 | 542,168 | 771,578 | 2,198,321 | 8,896,325 | 5,544,074 | 7,410,839 | 9,037,416 | 9,874,425 | 10,826,714 | 12,180,548 | 13,249,818 | 13,249,818 |

## Year 3

### POPSY INTERACTIVE CORP
### Revenue Projection for June 2012 to May 2013

| Description | JUN 12 | JUL 12 | AUG 12 | SEP 12 | OCT 12 | NOV 12 | DEC 12 | JAN 13 | FEB 13 | MAR 13 | APR 13 | MAY 13 | ANNUAL TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues (In US Dollars)** | | | | | | | | | | | | | |
| Sports Bar Revenues (Push Cell-Sync) | 210,000 | 210,000 | 210,000 | 630,000 | 840,000 | 1,050,000 | 1,050,000 | 840,000 | 630,000 | 630,000 | 720,000 | 510,000 | 7,530,000 |
| Live Event Revenues (Live Cell-Sync) | 219,360 | 239,030 | 256,040 | 617,980 | 598,560 | 636,810 | 653,160 | 267,610 | 287,100 | 385,650 | 657,600 | 743,600 | 5,560,400 |
| TV Sports Revenue (TV Cell-Sync) | 1,200,000 | 1,244,800 | 1,360,000 | 4,272,000 | 4,822,000 | 4,832,000 | 5,056,000 | 3,936,000 | 3,352,000 | 4,636,800 | 4,988,800 | 5,500,800 | 45,201,600 |
| TV Programming Revenue (TV Cell-Sync) | | | | | | | | | | | | | |
| Other Revenues - | | | | | | | | | | | | | |
| **TOTAL INCOME** | 1,629,360 | 1,693,830 | 1,826,040 | 5,519,980 | 6,260,560 | 6,518,810 | 6,759,160 | 5,043,610 | 4,269,100 | 5,652,450 | 6,366,400 | 6,754,400 | 58,294,000 |
| | | | | | | | | | | | | | |
| **Expenses (In US Dollars)** | | | | | | | | | | | | | |
| Smartphone, Web and Database Programming | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 300,000 |
| Executive Compensation | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 600,000 |
| Staff Salaries | 25,000 | 25,000 | 25,000 | 30,000 | 30,000 | 30,000 | 40,000 | 40,000 | 40,000 | 50,000 | 50,000 | 50,000 | 435,000 |
| Marketing & Sales Executives | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 37,500 | 408,000 |
| Executive Programming Expense | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Employee Benefits + Payroll Tax | 25,175 | 25,175 | 25,175 | 26,125 | 26,125 | 26,125 | 31,350 | 31,350 | 31,350 | 33,250 | 33,250 | 33,250 | 347,700 |
| Executive Performance Bonus | | | | | | 651,881 | | | 426,510 | | | 675,440 | 1,754,231 |
| | | | | | | | | | | | | | |
| Media, Control and Call Center | 20,000 | 20,000 | 22,000 | 24,200 | 26,620 | 29,282 | 32,210 | 35,431 | 38,974 | 42,872 | 47,159 | 51,875 | 390,623 |
| | | | | | | | | | | | | | |
| **General and Overhead Expenses** | | | | | | | | | | | | | |
| Advertisement | 15,000 | 15,000 | 20,000 | 35,000 | 40,000 | 40,000 | 25,000 | 25,000 | 20,000 | 15,000 | 15,000 | 15,000 | 280,000 |
| Sales Commissions | 122,202 | 127,037 | 136,953 | 413,999 | 469,572 | 488,911 | 506,937 | 378,263 | 320,183 | 423,934 | 477,480 | 505,580 | 4,972,050 |
| Office Expenses | 3,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 31,000 |
| Outside Consulting | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 |
| Printing and Reproduction | 11,412 | 12,554 | 13,809 | 15,190 | 16,709 | 18,380 | 20,218 | 22,240 | 24,464 | 26,910 | 29,601 | 32,561 | 244,047 |
| Professional Fees Legal/Accounting | 14,766 | 15,692 | 17,261 | 18,987 | 20,886 | 22,975 | 25,272 | 27,800 | 30,580 | 33,637 | 37,001 | 40,701 | 305,059 |
| Rent | 7,133 | 7,846 | 8,631 | 9,494 | 10,443 | 11,487 | 12,636 | 13,900 | 15,290 | 16,819 | 18,501 | 20,351 | 152,530 |
| Shows and Exhibitions | 20,000 | | | 20,000 | 8,354 | 9,190 | 10,109 | 20,000 | | 13,455 | 14,800 | 20,000 | 80,000 |
| Bookkeeping | 7,206 | 6,277 | 6,905 | 7,595 | 6,655 | 7,321 | 8,053 | 11,720 | 12,232 | 13,455 | 11,790 | 16,281 | 122,024 |
| Travel and Entertainment | 12,969 | 5,000 | 5,500 | 6,050 | 5,013 | 5,514 | 6,065 | 8,858 | 9,741 | 8,073 | 8,880 | 12,969 | 105,625 |
| Utilities | 3,424 | 3,766 | 4,143 | 4,557 | 8,355 | 9,190 | 10,109 | 6,672 | 7,339 | 9,768 | 8,880 | 9,768 | 78,214 |
| Miscellaneous | 5,706 | 6,277 | 6,905 | 7,595 | 6,655 | 9,190 | 10,109 | 11,120 | 12,232 | 13,455 | 14,800 | 16,281 | 122,024 |
| **Total General and Overhead Expenses** | 224,818 | 205,449 | 226,106 | 544,467 | 593,087 | 618,967 | 631,399 | 531,972 | 459,062 | 569,001 | 634,854 | 697,491 | 5,895,573 |
| | | | | | | | | | | | | | |
| **Total costs** | 402,493 | 389,124 | 405,781 | 732,292 | 782,232 | 1,469,755 | 859,959 | 769,793 | 1,121,295 | 820,123 | 890,263 | 1,053,056 | 10,256,127 |
| | | | | | | | | | | | | | |
| **EBITDA** | 1,226,867 | 1,310,706 | 1,430,259 | 4,787,688 | 5,478,728 | 5,035,055 | 5,899,201 | 4,279,757 | 3,147,804 | 4,832,327 | 5,476,137 | 5,171,344 | 48,035,873 |
| Corporate Tax rate  35% | | | | | | | | | | | | | |
| Corporate Tax | 429,404 | 458,747 | 497,091 | 1,675,691 | 1,917,555 | 1,769,269 | 2,064,720 | 1,497,915 | 1,101,731 | 1,691,315 | 1,916,648 | 1,792,470 | 16,812,555 |
| Net Income | 797,464 | 851,959 | 923,168 | 3,111,997 | 3,561,173 | 3,285,786 | 3,834,480 | 2,781,842 | 2,046,073 | 3,141,013 | 3,559,489 | 3,378,874 | 31,223,318 |
| | | | | | | | | | | | | | |
| Beginning Cash | 13,249,818 | | | | | | | | | | | | 13,249,818 |
| | | | | | | | | | | | | | |
| **NET CASH FLOW** | 14,047,282 | 14,899,241 | 15,822,409 | 18,934,407 | 22,495,580 | 25,781,365 | 29,615,846 | 32,397,688 | 34,443,760 | 37,584,773 | 41,144,262 | 44,479,136 | 44,473,136 |

# Year 1 – Roll Out

| Property Affiliation | Frequency | # of teams | Months | 1 JUN 2010 | 2 JUL 2010 | 3 AUG 2010 | 4 SEP 2010 | 5 OCT 2010 | 6 NOV 2010 | 7 DEC 2010 | 8 JAN 2011 | 9 FEB 2011 | 10 MAR 2011 | 11 APR 2011 | 12 MAY 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sports Properties** | | | | | | | | | | | | | | | |
| NFL Regular Season Games | 256 | 32 | | | | | | | | | | | | | |
| Sports Bars Tourney (# Bars) | | | | | | | | | | | | | | | |
| Live Cell-Sync (# Of games) | | | | | | | | | 50 | 50 | | | | | |
| TV Cell Sync (# Of games) | | | | | | | | | 1 | 2 | | | | | |
| NFL Playoffs | 8 | | | | | | | | | | | | | | |
| NFL Super Bowl | 1 | | | | | | | | | | | | | | |
| NCAA College Football | 200 | 117 | | | | | | | | | | | | | |
| Sports Bars Tourney (# Bars) | | | | | | | | | | | | | | | |
| Live Cell-Sync (# Of games) | | | | | | | | | | | | | | | |
| TV Cell Sync (# Of games) | | | | | | | | | | | | | | | |
| NASCAR Sprint Series | 36 | | | | | | | | | | | | | | |
| Live Cell-Sync (# Of races) | | | | | | | | | | | | | 200 | 200 | 200 |
| TV Cell Sync (# Of races) | | | | | | | | | | | | | 2 | 2 | 2 |
| NASCAR Nationwide Races | 34 | | | | | | | | | | | | | | |
| Live Cell-Sync (# Of races) | | | | | | | | | | | | | | | |
| TV Cell Sync (# Of races) | | | | | | | | | | | | | | | |
| Daytona 500 | 1 | | | | | | | | | | | | | | |
| NASCAR All Star Race | 1 | | | | | | | | | | | | | | |
| NASCAR Coca-Cola 600 | 1 | | | | | | | | | | | | | | |
| MLB Regular Season Games | 2430 | 30 | | | | | | 50 | 50 | | | | | | |
| Sports Bars Tourney (# Bars) | | | | | | | | | | | | | | | |
| Live Cell-Sync (# Of games) | | | | | | | | | | | | | | 200 | 200 |
| TV Cell Sync (# Of games) | | | | | | | | | | | | | | 2 | |
| MLB Home Run Derby | 1 | | | | | | | | | | | | | | |
| MLB All Star Game | 1 | | | | | | | | | | | | | | |
| MLB Playoffs | 12 | | | | | | | | | | | | | | |
| MLB World Series | 4 | | | | | | | | | | | | | | |
| MiLB Regular Season Games | 3600 | 50 | | | | | | | | | | | | | |
| Live Cell-Sync (# Of games) | | | | | | | | | | | | | | | |
| NBA Regular season | 1230 | 30 | | | | | | | | | | | | | |
| Sports Bars Tourney (# Bars) | | | | | | | | | | | | | | | |
| Live Cell-Sync (# Of games) | | | | | | | | | | | 75 | 75 | 200 | 200 | 200 |
| TV Cell Sync (# Of games) | | | | | | | | | | | 75 | 75 | 200 | | |
| NBA playoffs | 16 | | | | | | | | | | | | | | |
| NBA Finals | 4 | | | | | | | | | | | | | | |
| NCAA College Basketball | 975 | 446 | | | | | | | | | | | | | |
| Sports Bars Tourney (# Bars) | | | | | | | | | | | | | | | |
| Live Cell-Sync (# Of games) | | | | | | | | | | | | | | | |
| TV Cell Sync (# Of games) | | | | | | | | | | | | | | | |
| NCAA | 40 | | | | | | | | | | | | | | |
| TV Cell Sync (% of tournaments) | | | | | | | | | | | | | | | |
| IndyCar | 20 | | | | | | | | | | | | | | |
| TV Cell Sync (# Of races) | | | | | | | | | | | | | | | |
| Indy 500 | 1 | | | | | | | | | | | | | | |
| US Tennis | 20 | | | | | | | | | | | | | | |
| TV Cell Sync (% of tournaments) | | | | | | | | | | | | | | | |
| NHL | 1230 | 30 | | | | | | | | | | | | | |
| Sports Bars Tourney (# Bars) | | | | | | | | | 75 | 50 | 75 | 75 | 200 | 200 | 200 |
| Live Cell-Sync (# Of games) | | | | | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| TV Cell Sync (# Of games) | | | | | | | | | | | | | | | |
| NHL Playoffs & Stanley Cup | 10 | | | | | | | | | | | | | 1 | 1 |

# Year 2 – Roll Out

| Property Affiliation | Frequency | # of Events | Months / 12 MAY2011 | 13 JUN2011 | 14 JUL2011 | 15 AUG2011 | 16 SEP2011 | 17 OCT2011 | 18 NOV2011 | 19 DEC2011 | 20 JAN2012 | 21 FEB2012 | 22 MAR2012 | 23 APR2012 | 24 MAY2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sports Property** | | | | | | | | | | | | | | | |
| NFL Regular Season Games | 256 | 32 | | | | | | | | | | | | | |
| Sports Bars Toorney (# Bars) | | | | | | | | | | | | | | | |
| Live Cell-Sync (# of games) | | | | | | | | | | | | | | | |
| TV Cell Sync (# of games) | | | | | | | | | | | | | | | |
| NFL Playoffs | 8 | | | | | | | | | | | | | | |
| NFL Super Bowl | 1 | | | | | | | | | | | | | | |
| NCAA College Football | 200 | 117 | | | | | | | | | | | | | |
| Sports Bars Toorney (# Bars) | | | | | | | 400 | 400 | 400 | 400 | 400 | | | | |
| Live Cell-Sync (# of games) | | | | | | | 8 | 8 | 8 | 8 | 8 | | | | |
| TV Cell Sync (# of games) | | | | | | | 6 | 6 | 6 | 6 | 6 | | | | |
| NASCAR Sprint Series | 36 | | | | | | | | | | | | | | |
| Live Cell-Sync (# of races) | | | | | | | 2 | 2 | 2 | | 2 | 2 | 4 | 4 | 4 |
| TV Cell Sync (# of races) | | | | | | | 1 | 2 | 2 | | 2 | 2 | 4 | 4 | 4 |
| NASCAR Nationwide Races | 34 | | | | | | | | | | | | | | |
| Live Cell-Sync (# of races) | | | | | | | | | | | | 2 | 4 | 4 | 4 |
| TV Cell Sync (# of races) | | | | | | | | | | | | 2 | 4 | 4 | 4 |
| Daytona 500 | 1 | | | | | | | | | | | | | | |
| NASCAR All Star Race | 1 | | | | | | | | | | | | | | |
| NASCAR Coca-Cola 600 | 1 | | | | | | | | | | | | | | |
| MLB Regular Season Games | 2430 | 30 | | | | | | | | | | | | | |
| Sports Bars Toorney (# Bars) | | | 200 | 200 | 200 | 200 | 400 | | | | | | | 600 | 600 |
| Live Cell-Sync (# of games) | | | | | | | | | | | | | | 4 | 4 |
| TV Cell Sync (# of games) | | | | | | | | | | | | | | 4 | 4 |
| MLB Home Run Derby | 1 | | | | | | | | | | | | | | |
| MLB All-Star Game | 1 | | | | | | | | | | | | | | |
| MLB Playoffs | 12 | | | | | | | | | | | | | | |
| MLB World Series | 4 | | | | | | | | | | | | | | |
| NBA Regular Season Games | 3600 | 50 | | | | | | | | | | | | | |
| Live Cell-Sync (# of games) | | | 60 | 80 | 80 | 100 | 100 | 400 | | | | | 100 | 100 | 120 |
| NBA Regular season | 1230 | 30 | | | | | | | | | | | | | |
| Sports Bars Toorney (# Bars) | | | | | | | | 400 | 400 | 400 | 400 | 400 | 400 | 600 | 500 |
| Live Cell-Sync (# of games) | | | | 4 | 4 | | 4 | 4 | 6 | 6 | 4 | 8 | 8 | 10 | 12 |
| TV Cell Sync (# of games) | | | | 1 | 1 | | 2 | 2 | 6 | 6 | 4 | 8 | 8 | 10 | 12 |
| NBA Playoffs | 16 | | | | | | | | | | | | | | |
| NBA Finals | 4 | | | | | | | | | | | | | | |
| NCAA College Basketball | 375 | 445 | | | | | | | | | | | | | |
| Sports Bars Toorney (# Bars) | | | | | | | | 400 | 400 | 400 | 400 | 400 | 400 | | |
| Live Cell-Sync (# of games) | | | | 1 | 1 | | 2 | 2 | 4 | 6 | 8 | 8 | 8 | | |
| TV Cell Sync (# of games) | | | | 1 | 1 | | 2 | 2 | 4 | 6 | 8 | 8 | 8 | | |
| PGA | 40 | | | | | | | | | | | | | | |
| TV Cell Sync (% of tournaments) | | | | 1 | 2 | | 2 | 2 | 4 | | | 2 | | 3 | 4 |
| IndyCar | 20 | | | | | | | | | | | | | | |
| TV Cell Sync (% of races) | | | | 1 | 1 | | 1 | 1 | | 2 | | 2 | | 2 | 2 |
| Indy 500 | 1 | | | | | | | | | | | | | | |
| US Tennis | 30 | | | | | | | | | | | | | | |
| TV Cell Sync (% of tournaments) | | | | 1 | 1 | | 1 | | | 2 | | | | 2 | 2 |
| NHL | 1230 | 30 | | | | | | | | | | | | | |
| Sports Bars Toorney (# Bars) | | | | 1 | 1 | | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | |
| Live Cell-Sync (# of games) | | | | 1 | 1 | | 8 | 2 | 2 | 2 | 4 | 6 | 8 | 10 | |
| TV Cell Sync (# of games) | | | | 1 | 1 | | 8 | 2 | 2 | 2 | 4 | 6 | 8 | 10 | |
| NHL Playoffs & Stanley Cup | 10 | | | | | | | | | | | | | | |

41

# Year 3 – Roll Out

| Property Affiliation / Sports/Properties | Frequency | # of teams | Months | 25. JUN 2012 | 26. JUL 2012 | 27. AUG 2012 | 28. SEP 2012 | 29. OCT 2012 | 30. NOV 2012 | 31. DEC 2012 | 32. JAN 2013 | 33. FEB 2013 | 34. MAR 2013 | 35. APR 2013 | 36. MAY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **NFL Regular Season Games** | 256 | 32 | | | | | 350 | 350 | 350 | 350 | 350 | | | | |
| Sports Bars Tourney (# Bars) | | | | | | | | | | | | | | | |
| Live Cell Sync (# Of games) | | | | | | | 16 | 18 | 18 | 18 | 8 | | | | |
| TV Cell Sync (# Of games) | | | | | | | 16 | 18 | 18 | 18 | 8 | | | | |
| NFL Playoffs | 8 | | | | | | | | | | | | | | |
| NFL Super Bowl | 1 | | | | | | | | | | | | | | |
| **NCAA College Football** | 200 | 117 | | | | 350 | 350 | 350 | 350 | 350 | | | | | |
| Sports Bars Tourney (# Bars) | | | | | | | | | | | | | | | |
| Live Cell Sync (# Of games) | | | | | | 24 | 24 | 32 | 42 | 42 | | | | | |
| TV Cell Sync (# Of games) | | | | | | 12 | 12 | 12 | 12 | 12 | | | | | |
| **NASCAR Sprint Series** | 36 | | | 4 | 4 | 4 | 4 | 4 | 4 | | | 2 | 4 | 4 | 4 |
| Live Cell Sync (# Of races) | | | | 4 | 4 | 4 | 4 | 4 | 4 | | | 2 | 4 | 4 | 4 |
| TV Cell Sync (# Of races) | | | | | | | | | | | | | | | |
| **NASCAR Nationwide Races** | 34 | | | 4 | 4 | 4 | 4 | 4 | 4 | | | 2 | 4 | 4 | 4 |
| Live Cell Sync (# Of races) | | | | 4 | 4 | 4 | 4 | 4 | 4 | | | 2 | 4 | 4 | 4 |
| TV Cell Sync (# Of races) | | | | | | | | | | | | | | | |
| Daytona 500 | 1 | | | | | | | | | | | | | | |
| NASCAR All Star Race | 1 | | | | | | | | | | | | | | |
| NASCAR Coca-Cola 600 | 1 | | | | | | | | | | | | | | |
| **MLB Regular Season Games** | 2430 | 30 | | 350 | 350 | 350 | 350 | 350 | | | | | | 500 | 500 |
| Sports Bars Tourney (# Bars) | | | | 16 | 18 | 24 | 36 | 40 | | | | | | 60 | 80 |
| Live Cell Sync (# Of games) | | | | 16 | 18 | 24 | 36 | 40 | | | | | | 80 | 80 |
| TV Cell Sync (# Of games) | | | | | | | | | | | | | | | |
| MLB Home Run Derby | 1 | | | | | | | | | | | | | | |
| MLB All Star Game | 1 | | | | | | | | | | | | | | |
| MLB Playoffs | 12 | | | | | | | | | | | | | | |
| MLB World Series | 4 | | | | | | | | | | | | | | |
| **MLB Regular Season Games** | 3600 | 50 | | 120 | 140 | 140 | 160 | 160 | | | | | | 240 | 260 |
| Live Cell Sync (# Of games) | | | | | | | | | | | | | | | |
| **NBA Regular season** | 1230 | 30 | | | | | | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| Sports Bars Tourney (# Bars) | | | | | | | | 40 | 40 | 40 | 18 | 24 | 60 | 80 | 120 |
| Live Cell Sync (# Of games) | | | | | | | | 40 | 40 | 40 | 18 | 24 | 60 | 80 | 120 |
| TV Cell Sync (# Of games) | | | | | | | | | | | | | | | |
| NBA playoffs | 16 | | | | | | | | | | | | | | |
| NBA Finals | 4 | | | | | | | | | | | | | | |
| **NCAA College Basketball** | 375 | 25 | | | | | | 350 | 350 | 350 | 350 | 350 | 350 | | |
| Sports Bars Tourney (# Bars) | | | | | | | | 16 | 16 | 18 | 24 | 24 | | | |
| Live Cell Sync (# Of games) | | | | | | | | 16 | 16 | 18 | 24 | 24 | | | |
| TV Cell Sync (# Of games) | | | | | | | | | | | | | | | |
| **PGA** | 40 | | | 4 | 4 | 4 | 4 | | | | | | 4 | 4 | 4 |
| TV Cell Sync (% of tournaments) | | | | | | | | | | | | | | | |
| **IndyCar** | 20 | | | 2 | 3 | 3 | 2 | 1 | | | | | 2 | 2 | 2 |
| TV Cell Sync (% of races) | | | | | | | | | | | | | | | |
| Indy 500 | 1 | | | | | | | | | | | | | | |
| **US Tennis** | 20 | | | 2 | 2 | 2 | 2 | | | | | | 2 | 2 | 2 |
| TV Cell Sync (% of tournaments) | | | | | | | | | | | | | | | |
| **NHL** | 1230 | 30 | | | | | | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 |
| Sports Bars Tourney (# Bars) | | | | | | | | 30 | 40 | 40 | 50 | 60 | 60 | 20 | 20 |
| Live Cell Sync (# Of games) | | | | | | | | 30 | 40 | 40 | 50 | 70 | 20 | 20 | 50 |
| TV Cell Sync (# Of games) | | | | | | | | | | | | | | | |
| NHL Playoffs & Stanley Cup | 10 | | | | | | | | | | | | | | |

# EXHIBIT B

# Popsy Interactive Inc.
North East Office
25 Newbridge Rd
Hicksville, NY 11801
Phone: 646.765.9846
e-mail: peter.redling@popsyinteractive.com

November 21, 2011

Dear Shareholders:

Thank You for your patience over the last months ... it's been an extremely busy period for Popsy, both technically and strategically.

To start with, I'd like to address where our technology is now, and where it will be in the coming months. Currently, we have released "Version 2" of our Smart Phone application for the iPhone and Android operating systems. It is anticipated that by mid-December we will release "Version 2" for the BlackBerry OS. This new release has corrected some timing bugs and navigation issues mainly in the iPhone.

By the 1st Quarter of 2012, it is expected that we will release "Version 3", which will include a "REDEMPTION" button (which, amongst other things, will allow Popsy members to redeem their Popsy Reward Points at local businesses), an "Ad Catcher" button (which will allow members to 'click and capture' deals and prizes offered by participating TV advertisers) and Live Radio functionality (which will allow members to interact with Live Radio programming).

Strategically, as of the release of "Version 2", Popsy has gone into a *member acquisition* mode with an eye on, but not limited to, the South East states of North & South Carolina, Georgia and Virginia. It is our goal to secure 100,000+ active members within the 1st six months of this new release. Acquisition methods include aggressively utilizing Social Networking Sites (Facebook and Twitter), Press releases, College campus ad campaigns and Popsy Event promotions featuring ex-NFL, MLB and NBA players.

Popsy is currently negotiating with Ndidi Massay, formerly of ESPN, to secure second and first tier talent to work with Popsy. Aside from organizing talent for Popsy, Ms. Massay will also arrange meetings with the NFL, NBA and MLB Alumni Associations for the purpose of acquiring logo and marketing rights for participating players. The contract with Ms. Massay should be signed by no later than mid-December.

It is anticipated that by mid-January 2012, with the assistance of players brought in by Ms. Massay, Popsy will launch its "Play-Against-A-Pro" competitions for the NFL Playoffs and Super Bowl. These competitions will pit Popsy members against former pros for bragging rights and prizes. Popsy will do National Press Releases for these competitions as well as Regional TV appearances with the participating pros.

In closing, I would like to say "Thank You" again to All of our Popsy family for your patience – we are working 24/7 to make Popsy the most recognizable and popular interactive TV application not only nationally, but globally.

1

Sincerely,
Peter M. Redling
CEO & CTO

2

# EXHIBIT C

# popsy
## INTERACTIVE

# Investment Presentation

## CONFIDENTIAL – Do not distribute
### Terms and conditions subject to change





**popsy**
INTERACTIVE

# Overview

Popsy is a fun, competitive and branded mobile interactive platform that caters to networks, live events and the internet, rewarding Popsy Players for participation on our social website.

Brands, networks and properties receive multiple touch points to consumers via the smart phone and receive vital demographic information in real time through data-analytic reports.

Popsy is POP Culture.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

2

 **popsy** INTERACTIVE

# Investment Highlights

**Leading interactive platform for buyers and users:**
- Lack of clear competition, and fragmented services throughout the industry.
- Patent pending technology offers advantage within interactive space on multiple mediums.
- Consumers are willing to engage in branded interactivity if they are rewarded and non-invasive.

**Extremely large advertising market:**
- $41 billion in domestic TV advertising with $300 billion in global TV advertising.
- $25.1 billion in domestic web advertising with $151 billion in global web advertising.

**Extremely large and growing smartphone market:**
- 45 million smartphone users and growing domestically. Sales of smartphones to exceed $153 billion in 2014.
- In 2013, smartphone usage will equal cell phone usage in the U.S., while global use is larger and growing faster.

**Industry that can profit from and need Popsy:**
- Television networks and programs desperately need additional revenue or an additional revenue stream.
- Sports facilities and properties are currently unable to implement interactivity at a low cost and without hardware.
- Brands are requiring more accountability, stronger data and multiple touch points in media spending.

**Attractive and secure investment with strong return profile:**
- Launch strategy ensures Popsy is accepted and engaged as the single source in smartphone and web interactivity.
- Strategic partnerships provides defense to intrusion and ensures global expansion rapidly.
- Year five domestic net profits at 25% penetration are projected to exceed $400 million.

**Experienced and connected management and technical team with drive, proven success and the perfect skill sets:**
- 100 plus years experience in start-ups, interactivity, technology, media, sports, properties, and brand advertising.
- Highly experienced throughout all aspects of the business clientele including television, properties and agencies.
- Innovative and proven technical leadership with experienced back-end infrastructure.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

**popsy**
INTERACTIVE

# Popsy Overview

## What is Popsy?

- Popsy is unique, economically sound and an easy solution for interactive television.

- Smartphone application and website that engages television viewers, live event attendees and web-users through branded interactive platform.

- Patent-pending cell-sync technology communicates branded property messages with consumers in real time.

- All participation is coded and organized into analytic reports and graphs for accurate consumer demographic and behavior data.

## How does Popsy Work?

- Players set up their Popsy Profile and preferences on the website.

- Popsy Challenges are delivered via visual or audio notification on television screens, event jumbo-trons or on web advertisements.

- Popsy Players accumulate points for participation and redeem through the Popsy Reward Program.

- Group Play, called "Popsy Posses", provides contests and challenges similar to fantasy sports leagues.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

4



# The Popsy Environment

Home

Sports Bars

Stadium Events

Web Ads

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

# How It Works



Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

# Triggering Popsy on TV Screen



**popsy**
INTERACTIVE



**1.) TV-Cell-Sync is Engaged.**

**2.) Popsy Icon and Notification**



**3.) Branded Identification**

**4.) Challenge Open for Popsy Play**

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

7

# Popsy Interactive Sequence



Loading Challenge

Challenge Active

Challenge Submitted

Brand Offering

Instant Bar Code

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.



# The Popsy Community



- Completely Mobile

- Free to Download and Play Anywhere

- Highly Interactive

- Competition

- Rewarded for Playing

- Redemption for Participation

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.



# An Integration of Proven Platforms

- Social Media / Websites

- Fantasy Sports

- TV Text to Win / Vote

- Interactive Gaming

- Television Lower-Third Branding

- Stadium Voting

- Bar & Restaurant Interactive Games

- Rewards Programs

- Data-Analytics



Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

10

# The Popsy Advantage



Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.



**popsy** INTERACTIVE

# Other Competitive Advantages

- Popsy is unique, economically sound and an easy solution for interactive television and live events.

- Cost effective -- No additional hardware or software is needed by viewers, networks/properties, programs, brands, agencies, cable or satellite companies.

- Advertisers need Popsy. Popsy allows brands to engage with consumers on a one-on-one basis through our interactivity and social media platform.

- Provides advertisers a broader reach with greater precision and accountability. It also provides multiple touch points that other mediums can not achieve, allowing us to follow the lifestyle and demographics of the consumer.

- Popsy's Data-Analytic Reports are real-time, provide precise demographics based on area code and location, and can be viewed live through Popsy's website.

- Easy market penetration -- Completely new revenue stream and advertising inventory for all clients, and completely free and rewarding for the consumer.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

# Win⁵ Solution



**POPSY INTERACTIVE**

Every constituent of the Popsy platforms derives immense value

Live Events / Sports Bars - Group Participation & Response

Agencies & Brands – Interactive and Real Time Data

Consumers – Rewarded for Participation

TV – New Revenue, Interactive, Bypasses Carriers

Internet – Ads now have measurable interactivity

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

13



**popsy** INTERACTIVE

14

# Client Targets

Popsy generates revenue and valuable data that literally occurs in a consumer's back pocket.

**Initial Client Target:**

- TV Programs (Shows, News, Reality) – 81 Tier 1 and Tier 2 Programs
- TV Networks – 18 Tier 1 and Tier 2 Networks
- Company / Brands – 2,000 Tier 1 and Tier 2 Companies / Brands
- Agencies – 230 Tier and Tier 2 Media and Marketing Agencies
- Sports Programming on TV – 11,000 + Tier 1 Sports Programs per Year
- Sporting Events (Live at Stadium) – 4,000+ Tier 1 Sports Events per Year
- Bars & Restaurants – 250,000 + Establishments Nationally
- Web Advertisers – Exceeds 15,000 brands domestically, 80,000 Globally

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.



**popsy**
INTERACTIVE

15

# Brand Sponsored Beta-Test

Objective to prove that the Popsy business platform is accepted among its primary business partners to test acceptance and revenue:

- Properties
- Brands

Beta-test will be activated through the Live TV play-along platform.

- Properties – Popsy's sales team pitched an Interactive Baseball Tournament to 70 sports bars in the Piedmont and Raleigh-Durham, NC area. Players will interact with **live baseball games** guessing what hitters will do during any "user selected" at-bat. Fifty (50) of the sports bars were selected to participate. The tournament will take place in October for 4 weeks. All 50 bars are creating banners and coasters to promote contests. Proves assumption that properties will self-promote Popsy to generate more participation.

- Brands – Ford of the Carolinas has agreed to sponsor the tournaments. Sponsor revenue for October is projected at $15,000.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.



popsy INTERACTIVE

# Usage and Data- Domestic & Global

- As of Q1 2010 over 292 million people in the US spend an average of 158 hours, 25 minutes each month tuning into television.

- Q1 2010 data shows that 138 million people watching video on the Internet spent an average 3 hours, 10 minutes during the month doing so.

- As of 1Q10 the 20.3 million people who watch mobile video in the US spend an average 3 hrs, 37 minutes each month watching video on a mobile phone.

- Mobile video viewing continues its upward trend, with over 15 million Americans reporting watching mobile video inQ2 2009. This is an increase of 70% versus last year — the largest annual growth to date.

- According to a new market research report, Global Markets for Smartphones and PDAs, the global market for smartphones and personal digital assistants (PDAs) generated $58.7 billion in 2008. This should increase to $153.3 billion in 2014, for a compound annual growth rate (CAGR) of 21.2%.

- Although the Google Android OS only shipped 7.8 million units in 2009, this represented 1073.5% growth from 663,500 units in 2008. Global market share grew from 0.5% to 4.7%. – *data taken from comScore- 2009*

- Data from "Tuning in to Mobile TV" indicates that global revenues from mobile TV, which totaled $3.2 billion in 2009, should reach $7 billion by 2015. *Juniper Research*

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

# Smartphones Globally

**North America**

- Smartphone sales grew 69% in 2008.
- In 2008 the market continued to grow, despite a down economy.
- Smartphones are accounting for 20% of sales, a dramatic increase vs. 2007.

**Asia/Pacific**

- Smartphone sales recorded 2.3% sequential growth; Sales of high-end devices remained strong.
- 7.5 million unit sales in 2008.
- Nokia lost only 2% market share to Apple. RIM and Samsung are both gaining share.

**Europe, Middle East and Africa**

- Smartphone growth up 2% in Q4 of 2008
- Replacement purchases are dropping in Europe, yet smartphone sales increased by 9.6%.
- Samsung's Omnia was the major contributor to growth; Samsung share tripled in Q4 of 2008.

**Handsets sold globally in just 3rd qtr. 2009**

- Nokia : 16.15 million
- RIM : 8.52 million
- Apple : 7.04 million
- HTC : 2.65 million
- Samsung : 1.32 million
- Others : 5.36 million

**Overall : 41.067 million- Gartner Research**

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

17



# Smartphone Growth Projections



Dashed lines indicate projections

◇ Feature Phone      ◇ Smartphone

Sources: The Nielsen Company

18

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.



# Sizable Market and Growing

## iPhone OS Unique Distribution by Region– Ad Mob Network – April 2010



- ■ North America
- ■ Western Europe
- ■ Asia
- ■ Oceana
- ■ Latin America
- ■ Eastern Europe
- ■ Africa

19

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

# Sizable Market and Growing



*Source: NPD – Global growth*

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

21

# Android and iPhone Advertising Platform

## Unique Devices represents a device that has seen at least one advertising request in a given month



Source: Ad Mob Mobile Metrics Report- April 2010

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.



Average Session Length, in Minutes

*Source: Flurry Analytics*

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

# Competitor Analysis, Barriers to Entry

**Competitors:**

- Canoe: Cable Carriers – Interactive communication through remote control which only occurs during the carriers commercial spots.  Carriers are **unable** to engage in any on-screen interactivity.

- Text to Win / Vote – Occurs during TV programming or live events.  Occurs in only **one direction**, does not provide a community for participants, does not reward every participant, not interactive.

- TV Lower-Third Branded Trivia – Highly popular with brands, however is non-interactive content, **no** communication link, reward and community.

- TV Program to Web Content – Sends viewers to website to engage in interactive content.  Does **not** provide continuous two-way communication and only works for brands on that individual program.

- Google – Leading source in web advertising as a portal, but **does not** reward internet surfers.

**Barriers to Entry and Solutions:**

- Acceptance of Popsy application by consumers – Popsy will deploy a 10 month public relations campaign including both mainstream and category-specific targets, included standard viral campaigns.  Similar campaign as Facebook and Twitter, which included word of mouth.  Popsy will host self-supported daily and weekly contests to immediately reward Popsy Players.  Networks and events will self-promote to generate stronger revenue.

- Acceptance of Popsy by networks and properties– Offer networks and properties Popsy's at a discounted rate with free data-analytics to encourage growth.

- Acceptance of Popsy from brands / agencies – Offer brands and brand-agencies free Popsy Challenges on self-supported platform with data-analytics to stir growth and participation.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

# Delivering Results

**popsy**
INTERACTIVE

Popsy revenue is generated through three primary lines through the smartphone platform including management fees, sales, and data-analytics. The fourth, Popsy enabled web advertisements is extremely viable and can be engaged on the smartphone or through personal computers. The fifth revenue stream, gopopsy.com site advertising  is currently under analysis.

Management fees include the cost of client services and standard data-analytics for a client such as a television network or a sports stadium. Sales are derived through a standard commission of the client's Popsy sales price. Popsy sales price are calculated by combining CPM and sponsorship / advertising sales rates derived from basic television spot rates, sponsorship, and product integration / placement standards.

Through advisory, suggested sales price of a Popsy is 25% the average CPM rate.  Popsy receives 32% of the sales price, in which 25% covers operations and management, 5% for reward program redemption, and 2% for account executive commissions.

Popsy enabled web advertisement revenue will be generated through a low cost CPM which also provides clients real-time analytics.  Brands will pay a standard usage fee to enable their advertisement, including a click-through fee.

Lastly, the invaluable demographic and psychographic information received from Popsy Challenges provide extremely detailed data-analytic reports and survey and poll opportunities provide Popsy a viable research revenue stream.

Conservative projections of 25% of the targeted market would yield $404 million in year five.  This represents less than 5% of the total domestic spending in TV and web advertising.  Global projections is approximately three times domestic, yielding $1.2 billion at maturity, expected to materialize in year seven.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

24

# Revenue Streams and Projections

**popsy** INTERACTIVE

More than $450 billion is spent yearly on global TV and web advertising. This does not include brand sponsorships or product placement / integration.



**Popsy Interactive**

| TV Sports Programming | TV Shows, Reality and News Programming | Live Sporting and Entertainment Events | Sports Bars and Social Establishments | Enabled Web Advertisements | Data-Analytic Reports | GoPopsy.com Advertising Revenue |
|---|---|---|---|---|---|---|
| $185,000,000 | $72,000,000 | $49,500,000 | $33,000,000 | $40,000,000 | 22,500,000 | $2,400,000 |

Five Year Domestic = $404 million per year*

Five Year Global  = $808 million per year**

*25% of maximum targeted domestic revenue
** Domestic multiplied twice. Mature Global is 3X

25

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

# Leadership Team

POPSY INTERACTIVE

## Ryan Kurek – CEO and President

- 12 years experience in brand marketing and media.
- Developed Rockwell Automation's $5 million motorsports marketing and advertising platforms.
- CEO and Founder of LVRG Marketing + Media, sports business and entertainment agency responsible for major brands including Best Buy, LG Electronics, General Electric, Bayer and World Financial Group. 800% growth in 3 years.
- Chief consultant to Communications Corporation of America, a television conglomerate of 23 domestic markets, leading the $70 million company on monetization and development business strategies within the sales and marketing departments.
- Co-creator and Executive Producer of the television show *3 Wide Life*. In third year, reached 81 million households and ranked as the #1 aired racing show in America. Developed entire business infrastructure and secured all sponsors and advertisers.
- Creator, Executive Producer of *GrassRoots*, a sports documentary series set to launch in 2011.
- Board of Advisor at Clemson University Marketing Department, Center for the Advancement of Marketing and Social Science, and the St. Jude Children's Hospital SAB.
- Sourced in nine industry publications, recipient of two Telly Awards, and authored more than 60 published papers on marketing and media business subjects.
- Graduate of Clemson University in Marketing from the College of Business and Behavioral Science.

## Peter Redling – CTO and Managing Director

- 30 years experience in information technology, computer programming and interactive technology.
- On the COMEX, developed first of its kind computer program in 1980 providing technical analysis and brokering services for domestic and overseas trading institutions.
- Clientele portfolio included Merrill Lynch, Bayerische Vereinsbank, Deutschebank, Citibank, Credit Lyonnais, Chase Bank, Société Générale, UBS, HSBC, Credit Suisse, Swiss Bank Corporation and Abu Dhabi Investment Corporation.
- Formed GEDI Systems Incorporated in 1996, with a vision to combine the internet with that of broadcast television. GEDI worked extensively with Cablevision to create user applications for interactive television (ITV).
- In 2004 GEDI partnered with SpiralAxis iDesigns Inc. to form Your Choice Interactive, Inc (YCI) to develop interactive television applications. In 2005 YCI built the first television-based off-track Betting (OTB) platform of its kind. The system was sanctioned by New York Racing Wagering Board.
- In 2007, YCI's patent was approved through its Interactive Television (ITV) advertising model that was built and designed by Mr. Redling.
- In 2009, Mr. Redling initiated a new patent based on smartphone application for interactivity including television, live events and social establishments. Popsy Interactive was created in 2010 based on the global interactive platform.
- Attended Rutgers University, majoring in Economics.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.



# Management and Advisory Team

**Jackie Barrios – Executive Vice President and Co-Founder**

- 30 years experience in launching new businesses and helped launch one of the first financial interactive data systems, Telerate Systems Incorporated. Ms. Barios was integral in increasing the company's revenues by an average of $10 million annually. She helped form GEDI Systems Inc. and then Your Choice Interactive with Peter Redling for the ITV industry.

**Firoz Shaikh – CFO and Co-Founder**

- Certified CPA from domestic to multinational accounting and tax set-up, specializing in start-up ventures and capital management.

**David Aregood – Executive Vice President of Sales and Marketing** — *Remainder — No Voting Rts.*

- 14 years experience in sales and management roles with the top technology companies in the media industry such as TV Guide Interactive, Scripps Networks and Liberty Media. Key experience in sales channel development, entertainment media, marketing and brand integration, advertising sales, and contract negotiation.

**Tom Issing – Director of Strategic Partnerships**

- 30 plus years of partner and business relationships , extending from sports properties, television networks and capital partners.

**Maher Kawar – Director of Television & Property Sales**

- 14 years experience in television sales and marketing, including NBC Universal, BET, Comcast, and Time Warner.

**Wade Leaphart – Director of Property Sales**

- 10 years experience in sports property and facility sales and marketing, including the NBA,NASCAR and the NHL.

**Ragnar Meitern – Special Advisor, Media Investments, Capital Raise, Mergers and Acquisitions**

- Managing Director, Head of Telecoms, Media and Technology banking at Standard Chartered Bank in Dubai, responsible for emerging markets in Europe, Middle East and Africa, Mr. Meitern has more than 14 years of investment banking advisory and capital raising experience.  Experience and vast global resources for new business development and integration

**Steve Pruett – Special Advisor, Television Network and Program Development**

- 30 years of media expertise including consulting corporations such as DirecTV, Thomson Consumer Electronics (RCA), NBC, GE, FOX and Warner Bros. Mr. Pruett is a FOX Television Board Governors Member.

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.

27

**popsy** INTERACTIVE

# Contact Information

Ryan Kurek

President & CEO

Ryan.Kurek@PopsyInteractive.com

Phone: (704)604.6777

Fax: (803)802.8765

Carolina Headquarters:

Popsy Interactive Inc.

1184 Springmaid Ave.

Suite 201

Fort Mill, SC 29708

Confidential and Proprietary. Property of Popsy Interactive Incorporated. © 2010. Do not distribute.